Filed 5/21/18

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S065233 |
| v. | ) | |
| | ) | |
| FLOYD DANIEL SMITH, | ) | San Bernardino County |
| | ) | Super. Ct. No. FWV08607 |
| Defendant and Appellant. | ) | |
| _____ | ) | |

A jury convicted defendant Floyd Daniel Smith of one count of first degree murder (Pen. Code, § 187), and found true an alleged special circumstance that he committed the murder while lying in wait (*id.*, § 190.2, subd. (a)(15)). The jury also convicted defendant of two counts of attempted voluntary manslaughter (*id.*, §§ 664, 192, subd. (a)), two counts of first degree burglary (*id.*, § 459), and one count each of assault with a firearm (*id.*, § 245, subd. (a)(2)), false imprisonment (*id.*, § 236), and possession of a firearm by a convicted felon (*id.*, former § 12021, subd. (a)(1)). As to all but the last charge, the jury found firearm use enhancement allegations to be true (*id.*, § 12022.5). At the special circumstance phase, the jury found true a second special circumstance—that defendant had a prior murder conviction (*id.*, § 190.2, subd. (a)(2)).

At the penalty phase, the jury returned a verdict of death. This appeal is automatic. (Pen. Code, § 1239, subd. (b).) We affirm the judgment in its entirety.

# I. FACTS

## A. Guilt Phase Evidence

Defendant was convicted of the murder of Joshua Rexford. The prosecution argued that defendant committed the murder in retaliation for the murder of defendant's close friend, Manuel Farias.

### 1. Prosecution's case

On November 23, 1994, Linda Farias attended the funeral of her brother Manuel. After the funeral, she overheard defendant conversing with three other men. Although Linda could not remember who said what, defendant did most of the talking. In the conversation, the men said that "Brian" killed Farias, that "Josh" was Brian's cousin, and that "they were going to get through him to find Brian." Within a day or two of the funeral, defendant had a conversation with Troy Holloway. Defendant questioned Holloway about Joshua Rexford, who, like Holloway, played on the football team at A.B. Miller High School in Fontana. Defendant asked how Rexford was, what he was like, where he lived, and where he hung out, explaining that he wanted to talk to Rexford.

On the morning of November 27, four days after the funeral, Michael Honess saw defendant and a Hispanic man sitting on a wall in the back of Honess's apartment complex in Rancho Cucamonga. Later that morning, Honess again saw defendant, now alone, sitting on the stairs adjacent to Honess's third floor apartment. Defendant asked if he could use the telephone in Honess's apartment to call his mother. Honess allowed him to do so, but instead of calling his mother, defendant called a directory service and requested the number of the Church of God in Christ. He called the number he received from the directory service but did not appear to speak to anyone. He then left Honess's apartment.

Ten minutes later, defendant knocked on Honess's door. Honess opened the door and walked back into his apartment, assuming that defendant wanted to

make another call.  As Honess walked away, defendant, holding a dark gray or black automatic pistol, grabbed him and pushed him onto his hands and knees.  Two other men then entered the apartment:  the Hispanic man Honess had previously seen with defendant and a White man whom defendant called "Jay," who was carrying a sawed-off shotgun.  Defendant told Jay to look through the blinds out the window and to search for telephones in the apartment.  He wiped off Honess's telephone with a paper towel and cut the telephone wire.  The Hispanic man took some of Honess's money, but defendant told him to put it back.

After 15 to 20 minutes, the three men left Honess's apartment; defendant told Jay to wait in the car.  Before leaving, defendant told Honess that " 'someone has done something bad' " and that when Honess spoke to the police he should "tell the truth."

Defendant then went downstairs to the apartment of Maikolo ("Walter") Pupua, who was seated in the living room with Ndibu ("Freddie") Badibanga and Joshua Rexford.  He knocked on the door and Badibanga told him to enter.  He opened the door and immediately opened fire with what appeared to be a nine-millimeter pistol.  Pupua dove behind a speaker in the corner of the room, while Badibanga crawled to the bedroom and jumped out a window.  Badibanga saw a second man accompanying defendant; Pupua saw only defendant, but inferred that there was a second gunman from the large number of shots ("at least about 15 or 16") that were fired.

Rexford, who was struck five times, died as a result of gunshot wounds in his chest and abdomen.  "[L]arge caliber bullets . . . approximately nine millimeters in diameter" were recovered from his body.  Seven cartridge cases were recovered from the scene of the shooting, six of which had been fired and belonged to nine-millimeter cartridges.  One cartridge, a ".25 caliber auto," was unfired.

3

That evening, defendant and two men came to the home of Troy Holloway. Defendant gave Holloway a nine-millimeter pistol, which was unchambered but loaded with four bullets. He did not charge Holloway for the gun, but told him that "a real man never shows anybody what he got." About three or four days later defendant called Patrick Wiley and asked him to retrieve the gun from Holloway. Wiley did so, returning the gun to defendant.

### 2. *Defense case*

The defense conceded that defendant was present at the scene of the murder, but claimed he was not there of his own free will. Testifying on his own behalf, defendant claimed that the night before the murder, three men kidnapped him and held him in his apartment overnight. The next day, they took him to an apartment complex, where they "loaf[ed] around . . . for a long time." Defendant spoke to Honess and used his telephone to call his church. As Honess was starting to leave the apartment, defendant saw two of his kidnappers, a Hispanic male and a White male, approaching Honess's doorway. Fearing that the White male was going to start shooting because defendant was not sitting on the stairs, as his kidnappers had instructed him, defendant grabbed Honess's arm and pulled him to safety.

According to defendant, he and his kidnappers then waited in Honess's apartment. Defendant eventually left with the Hispanic kidnapper, while the White kidnapper went down a different flight of stairs. The Hispanic kidnapper took defendant to Pupua's apartment. When they entered the apartment, the Hispanic kidnapper began shooting. Defendant claimed he tried to run away but got stuck between the door and a wall. Eventually he exited the apartment and ran to the apartment's parking lot, with the Hispanic kidnapper behind him. Defendant and the three kidnappers then got into defendant's car and drove some

4

distance before they parked. A white truck approached. The kidnappers exited defendant's car and told defendant he could leave. They departed in the truck.

Defendant denied giving a gun to Troy Holloway. He also denied making the statements attributed to him by Linda Farias at the funeral of her brother Manuel.

### 3. Jury verdict

The jury convicted defendant of murdering Rexford and found a lying-in-wait special circumstance to be true. With respect to the attempted murder charge, the jury convicted defendant of the lesser included offense of attempted voluntary manslaughter. The jury also convicted defendant of burglarizing Honess's apartment and falsely imprisoning him, of burglarizing Pupua's apartment, and of possession of a firearm by a convicted felon, and it found firearm use enhancements to be true as to all but the last offense. The jury acquitted defendant of a charge that he dissuaded a witness.

### B. Special Circumstance Phase Evidence

The prosecution presented a fingerprint card, a Riverside County Superior Court minute order, and California Youth Authority records showing that on July 13, 1984, defendant pleaded guilty to first degree murder, for which he was incarcerated in the Youth Authority. Defendant was 16 years old when he committed the murder.

### C. Penalty Phase Evidence

The prosecution presented evidence that on January 27, 1984, when defendant was 16 years old, he accosted Felton M. at gunpoint, forcing him to take defendant to his house and to engage in sexual acts. Defendant then took Felton to a field, forced him to remove his clothes, and left with his wallet, warning that defendant would kill him if he said anything.

5

The next day, defendant shot and killed Virgil Fowler. In a statement to the police after the shooting, defendant said he was with Orlando Hunt and Calvin Wade when Hunt told him to rob Fowler, who was walking towards them. Defendant drew his gun, told Fowler to lie on the ground, and told Hunt to look through Fowler's pockets. When Fowler got up and began to run, defendant fatally shot him.

Joshua Rexford's mother testified that after the jury left the courtroom at the end of the guilt phase, defendant simulated a pistol with his fingers and pointed the "finger-pistol" in her direction. She told him, " 'you're so disrespectful' "; defendant replied that she was a " 'fucking bitch.' "

The defense presented evidence that defendant's mother was a sex worker who used drugs and alcohol and smoked cigarettes while pregnant with defendant. During that time she was prescribed antipsychotic and antidepressant medication and suffered a severe dystonic reaction during the sixth or seventh month of pregnancy, causing her to fall and suffer physical trauma to her uterus. Forensic psychiatrist David Glaser testified that these chemical and physical traumas could have adversely affected the development of defendant's brain.

According to defense witnesses, defendant had no relationship with his father and his mother was neglectful and physically abusive. Defendant was severely abused, physically and sexually, by his older brother George, who forced defendant to orally copulate him on repeated occasions over a period of years and who burned defendant's genitals with a hot iron when he was a young child.

When defendant was 13 years old, he was made a ward of the state. He thereafter had only brief negative interactions with his mother and was placed in six or seven foster homes between the ages of 13 and 17. Dr. Glaser testified that defendant's history of neglect, abandonment, and abuse changed him from a passive, chronic victim into "a chronic, active perpetrator." Dr. Glaser opined that

6

the abuse and abandonment caused defendant to suffer from displaced rage and extreme narcissism.

The defense presented evidence that defendant worked on behalf of New Life Ministries for "a few months" to help establish a community-based, youth-oriented church by engaging in recruitment and acting as a driver. Defendant's four-year-old son testified that he enjoyed visits with his father.

## II. DISCUSSION

### A. Pretrial Issues

*1. Trial court's denial of defendant's* Batson/Wheeler *motions*

Defendant, who is Black, argues that he was deprived of his constitutional rights to equal protection and a representative jury because the prosecutor exercised peremptory challenges to exclude Black prospective jurors. (See *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*); *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*).) During jury selection, after the prosecutor used three of his first five peremptory challenges to excuse Prospective Jurors Sandra D., Reginia S.,[1] and Huey D., all of whom are Black, defendant made a *Batson/Wheeler* motion. The trial court found that the defense had made a prima facie showing that the challenges were based on group bias, but it denied the motion after the prosecutor gave his reasons for the challenges. The prosecutor thereafter struck five non-Black jurors and on three occasions accepted the panel. But when the defense passed the challenge for the first time, the prosecutor asked to approach the bench and announced that he intended to strike the sole remaining Black juror, Elizabeth K., whereupon the defense made a second *Batson/Wheeler* motion. The court

---

[1] The record contains references to both "Reginia S." and "Regina S." For the sake of consistency, we use the first spelling.

again found that the defense had made a prima facie showing, and again denied the motion after the prosecutor explained the challenge.

Apart from the four jurors challenged by the prosecution, there were at least three and possibly five Black prospective jurors remaining in the venire when the parties began to exercise their peremptory challenges. One of these was later excused because of a hearing problem, and the others were never called. As a result, the panel that tried defendant's case included no Black jurors. Defendant now contends that the trial court erred when it denied his *Batson/Wheeler* motions.

"[A] party may exercise a peremptory challenge for any permissible reason or no reason at all" (*People v. Huggins* (2006) 38 Cal.4th 175, 227) but "exercising peremptory challenges solely on the basis of race offends the Fourteenth Amendment's guaranty of the equal protection of the laws" (*id.* at p. 226; see generally *Batson*, *supra*, 476 U.S. 79). Such conduct also "violates the right to trial by a jury drawn from a representative cross-section of the community under article I, section 16, of the California Constitution." (*Wheeler*, *supra*, 22 Cal.3d at pp. 276–277.)

"A three-step procedure applies at trial when a defendant alleges discriminatory use of peremptory challenges. First, the defendant must make a prima facie showing that the prosecution exercised a challenge based on impermissible criteria. Second, if the trial court finds a prima facie case, then the prosecution must offer nondiscriminatory reasons for the challenge. Third, the trial court must determine whether the prosecution's offered justification is credible and whether, in light of all relevant circumstances, the defendant has shown purposeful race discrimination. [Citation.] 'The ultimate burden of persuasion regarding [discriminatory] motivation rests with, and never shifts from, the [defendant].' " (*People v. Manibusan* (2013) 58 Cal.4th 40, 75.)

Here, the trial court found that defendant had satisfied the first of these steps by making a prima facie showing of group bias, and it evaluated the prosecutor's reasons for the challenges. When this occurs, the adequacy of the prima facie showing becomes moot (*Hernandez v. New York* (1991) 500 U.S. 352, 359; *People v. Elliott* (2012) 53 Cal.4th 535, 560–561), and the reviewing court skips to the third stage to determine whether the trial court properly credited the prosecutor's reasons for challenging the prospective jurors in question (*Elliott*, *supra*, at p. 561; *People v. Riccardi* (2012) 54 Cal.4th 758, 786–787).

While still relevant, the statistical showing that motivated the finding of a prima facie case is not dispositive at this third stage. Rather, "[a]t the third stage of *Batson*, the 'critical question . . . is the persuasiveness of the prosecutor's justification for his peremptory strike.' (*Miller-El v. Cockrell* (2003) 537 U.S. 322, 338–339.) Usually, 'the issue comes down to whether the trial court finds the prosecutor's race-neutral explanations to be credible. Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy.' (*Id.* at p. 339.) ' "As with the state of mind of a juror, evaluation of the prosecutor's state of mind based on demeanor and credibility lies 'peculiarly within a trial judge's province.' " ' (*Ibid*.) Thus, in reviewing a trial court's reasoned determination that a prosecutor's reasons for striking a juror are sincere, we typically defer to the trial court and consider only 'whether substantial evidence supports the trial court's conclusions.' (*People v. Lenix* (2008) 44 Cal.4th 602, 627 (*Lenix*).)" (*People v. Banks* (2014) 59 Cal.4th 1113, 1146.)

"[O]ne form of circumstantial evidence that is relevant, but not necessarily dispositive, on the issue of intentional discrimination" is a comparison of the treatment of an excused juror with other similarly situated jurors. (*Lenix*, *supra*,

9

44 Cal.4th at p. 622.) "[E]vidence of comparative juror analysis must be considered . . . even for the first time on appeal if relied upon by the defendant [if] the record is adequate to permit the urged comparisons." (*Ibid.*) But when, as here, a defendant "wait[s] until appeal to argue comparative juror analysis," our "review is necessarily circumscribed," and we "need not consider responses by stricken panelists or seated jurors other than those identified by the defendant." (*Id.* at p. 624.) We review the trial court's ruling on the question of purposeful racial discrimination under a deferential substantial evidence standard, so long as " 'the trial court has made a sincere and reasoned attempt' " to evaluate each nondiscriminatory justification offered. (*People v. McDermott* (2002) 28 Cal.4th 946, 971; see *People v. Hamilton* (2009) 45 Cal.4th 863, 900–901 (*Hamilton*); *People v. Avila* (2006) 38 Cal.4th 491, 541.)

a. *Prospective Juror Sandra D.*

When initially questioned about his reasons for challenging Sandra D., the prosecutor first referred to her opinions about the then-recent not guilty verdict in the high-profile murder prosecution of O.J. Simpson, as well as her views on the death penalty: "[M]y main concern was her feelings about the O[.]J[.] Simpson case, which I felt was undefined. I thought [she] was sympathetic to Mr. Simpson and I felt that her opinions concerning the death penalty were extremely scrambled in terms of either pro or anti-death. So my main concern on her was her weak opinions concerning the death penalty or undefined opinions concerning the death penalty." After the court gave him a chance to look at his notes, the prosecutor added: "[S]he's the person who said that she would have a very hard time judging the person in the death penalty case. Does not want the responsibility of making that decision. She's divorced. She's not married. She lives in the Bloomington area, and she's only lived there for five months. She's also lived in another street in Bloomington, Riverside, and Rialto, [as a result of] which I . . . have some

10

difficulty concerning her stability in the community.  [¶]  And her educational concerns . . . consisted of sometime at RCC, less than a year, evidently, and perhaps as much as a year . . . at Valley College."

The trial court then recessed until after lunch to give the prosecutor a chance to refresh his recollection of the questionnaires, each 42 pages long, filled out by each of the challenged prospective jurors.  When the court reconvened (outside the jury's presence), the prosecutor reiterated his concerns about Sandra D.'s ability to impose the death penalty.  He also noted that he "did not see the type of community leadership that [he] would hope for in a leader of group dynamics of the thing."

The trial court found the prosecutor's explanation credible, stating that "there was no problem with the non-racial basis for exercising the peremptory."  It contrasted Sandra D. with Reginia S. and Huey D., the other two Black jurors who, at the time of its ruling, had been challenged by the prosecutor, explaining that there was a "much closer question" as to the latter two.

Sandra D.'s answers on her juror questionnaire support the prosecutor's concern that she would be reluctant to vote for death.  When asked whether her feelings on the death penalty were such that she would "never be able to vote for the penalty of death of a defendant," she did not check either "yes" or "no," but instead wrote:  "I wouldn't want to vote for anyone to die.  But if they killed someone then I think they deserve to die."  When asked whether her feelings were such that she would "always be able to vote for the penalty of death," she again did not check "yes" or "no," but wrote:  "I think it would depend on how it happen [*sic*].  I wouldn't want to have to vote for the penalty of death.  I just don't want to be the reason why someone died."  In response to a question asking whether she could see herself, "in the appropriate case, rejecting life imprisonment without the possibility of parole and choosing the death penalty," she checked "no," and

11

wrote: "I don't want to have to make that decision on anyone." And when asked whether she could consider imposing the death penalty "as a realistic and practical possibility," she checked "no," and explained: "I would feel like I killed them. It would bother me. But if he did it he deserves the Death Penalty." Sandra D. also checked a box indicating that she was not upset by the O.J. Simpson verdict, explaining: "I really don't know if he did it or not."

Sandra D. reiterated her reluctance to impose the death penalty during the *Hovey* voir dire.[2] She testified: "I just feel like I don't want to be the one to say someone gets the death penalty. It's like I'm killing someone." When asked whether, if she determined after hearing the evidence and the law that death was the appropriate penalty, she would be able to come back with that decision, she replied: "Probably." She explained: "if . . . I really felt that [the murder] was done, I think I would vote—I mean if it came down to it, I wouldn't want to—but I would do it." Sandra's answers might arguably have justified a challenge for cause, though the prosecutor did not make such a challenge.

Defendant points out that Jurors Nos. 46, 119, and 370, all of whom were members of the jury panel, expressed some hesitance about the death penalty, but the prosecutor did not challenge them. He also notes that Alternate Jurors Nos. 389 and 91 indicated some hesitance to vote in favor of death. But each of these jurors also indicated in other questionnaire responses that they would be able to vote in favor of the death penalty if circumstances warranted. None answered, as did Sandra D., that they simply did not "want to have to make that decision on anyone."

---

[2]     *Hovey v. Superior Court* (1980) 28 Cal.3d 1.

12

As defendant notes, some of Sandra D.'s questionnaire answers were favorable to the prosecution. For example, she repeatedly said she supported the death penalty, explaining "I feel if you kill someone you don't have the right to live." She agreed with the saying " '[a]n eye for an eye,' " and she had two sisters who were correctional officers. Defendant also disputes the validity of the concerns expressed by the prosecutor about Sandra D.'s stability in the community, pointing out that she had been employed at Kaiser Permanente for more than seven years; she had lived in the same home for five years, then lived in two others for a total of five years; she was a Girl Scout leader; and she planned to open a home day care center. And while the prosecutor mentioned in passing that Sandra was divorced, defendant points out that he did not strike Juror No. 392, who also was divorced. Nor is it clear exactly how divorce would affect the desirability of a prospective juror from the prosecution point of view in this case.

Nevertheless, the record amply supports what the prosecutor described as his primary concern—that despite Sandra D.'s belief in the death penalty in the abstract, she would have great difficulty in actually voting to impose it. She expressed this concern repeatedly, both in her written answers to the jury questionnaire and in her testimony during the *Hovey* voir dire, and she was never able to say with certainty that she would be able to vote for death, initially stating that she would be unable to do so and later stating only that she could "probably" do so. Substantial evidence supports the trial court's ruling that the prosecutor did not challenge Sandra D. because of her race.

### b. Prospective Juror Reginia S.

When asked to state his reasons for challenging Reginia S., the prosecutor initially mentioned that her brother was a juvenile delinquent, that she came to court casually dressed (in a T-shirt, sandals, and sweatpants), that she had no children or family in the area, that she had limited college education, and that she

13

did not appear to be "a stable person in the community, based upon her housing history, and job history." After reviewing his notes, he added that she had indicated a belief that race plays a part in the criminal justice system, and that she had four different addresses as an adult. He acknowledged making a mistake with respect to her college education—he had noticed that she had attended community college, but he had not realized that she thereafter graduated from Pepperdine University.

After reviewing Reginia S.'s jury questionnaire, the prosecutor began by reiterating his concern about her manner of dress, noting that it was "completely different from the attire of all the other jurors that we presently have in the box." He then pointed to her belief that the system is not always fair and that race sometimes plays a role, expressed concern about her views on the O.J. Simpson case, and noted that while she believed in the death penalty, she said the prosecution "must absolutely prove guilt" and that she would only impose the death penalty if it is proven "without a doubt that the crime was committed." Finally, he again noted that her brother had been in "the juvenile system."

Defense counsel questioned the prosecutor's reliance on the fact that Reginia S.'s brother was a juvenile delinquent, pointing out that the prosecutor did not know what crimes the brother had committed. With respect to Reginia S.'s attire, counsel argued: "I don't know how it would relate . . . to her ability to understanding issues, to sit . . . as a fair and impartial juror, or to consider and follow the Court's instructions on evidence." Counsel challenged the prosecutor's assertion that Reginia was unstable, pointing out that she had been married for 11 years and had good jobs. And counsel pointed out that Reginia wrote on her questionnaire that she was for the death penalty, would vote to keep it, and could vote for it in an appropriate case.

14

The trial court discussed the prosecutor's challenges to Reginia S. and to Huey D. together, ruling that they were not based on group bias. The court said it would "accept the truth of [the prosecutor's] statement that he was concerned about [the] statements [of Reginia S. and Huey D.] about their sense of the degree of proof required that exceeds proof beyond a reasonable doubt" and found "that is a truthful comment and that that is his . . . motivation." With regard to other reasons mentioned by the prosecutor for challenging Reginia S., the court noted that it "would not have shared" all the prosecutor's concerns about Reginia S. and Huey D., but acknowledged, "I'm not the lawyer trying this lawsuit." The court later added: "That's not to say that I would have exercised the peremptories the same as you, but it's your case not mine. And I think the ultimate question whether there's purposeful discrimination, I don't at this point find that there has been. I don't believe that your motivation has been a racial motivation."

The trial court's ruling emphasized the prosecutor's stated concern that Reginia S. would not vote to impose a death sentence unless defendant's guilt was proved to a standard greater than proof beyond a reasonable doubt. The concern is both plausible and supported by the record. When asked to describe her general feelings about the death penalty, Reginia wrote: "I'm for it, but we must absolutely prove guilt." And when asked whether she had "negative or positive feelings about the death penalty," she wrote: "Neither. I just think if we impose death we need to be sure they did the crime." Although these answers would not justify a challenge for cause, the prosecutor could reasonably conclude that Reginia S. would be sympathetic to an argument that lingering doubt about defendant's guilt ought to guide the jury's determination of the appropriate penalty—an argument that would be entirely legitimate, but unfavorable to the prosecution.

Defendant argues the prosecutor's failure to voir dire Reginia S. on her view of the standard of proof she would require before returning a death verdict indicates the prosecutor's stated reason was pretextual. Defendant is correct that an attorney's failure to meaningfully examine a prospective juror about a subject about which the attorney claims to be concerned can constitute evidence of pretext. (*Miller-El v. Dretke* (2005) 545 U.S. 231, 246.) But here, unlike in *Miller-El*, for example, the prosecutor's stated concerns arose from a pair of questionnaire responses that spoke for themselves; no additional clarification was needed to ascertain Reginia S.'s meaning. (Cf. *id.* at p. 244 [in light of prospective juror's "outspoken support for the death penalty," prosecutor "would have cleared up" a misunderstanding concerning the juror's attitude toward rehabilitation as a factor in penalty decision had the prosecutor truly been concerned with the matter]; *id.* at p. 246 [noting that, after the prospective juror indicated that he did not know much about his brother's prior conviction, "the prosecution asked nothing further about the influence his brother's history might have had on [the juror], as it probably would have done if the family history had actually mattered"].) Whatever inference may arise from the prosecutor's lack of questioning is not so strong as to undermine the trial court's determination that Reginia S.'s views on the standard of proof did, in fact, matter to the prosecutor.

Defendant further points out that the prosecutor did not challenge Juror No. 46, who wrote that the death penalty should not be considered unless the sentencer is "<u>absolutely</u> sure of guilt." But Juror No. 46 also wrote that she could set aside her feelings about when to impose the death penalty, explaining: "Would choose appropriate penalty based on evidence presented—not my opinion about punishment." In response to that same question, by contrast, Reginia S. wrote that she could see herself voting for death "if it can be proven without a doubt . . . [that] the crime was committed." Defendant also points out that the prosecutor did

16

not challenge Juror No. 119 and Alternate Jurors Nos. 389 and 91, each of whom expressed some reluctance to impose the death penalty. But unlike Reginia S., these jurors did not say that they would not impose death unless guilt was proved to an absolute certainty.

As noted above, the prosecutor gave several other reasons for challenging Reginia S. Some of these additional reasons find support in the record. Regarding the prosecutor's assertion Reginia S. was more casually dressed than the other prospective jurors, defense counsel agreed she was wearing a T-shirt and sweatpants but questioned the import of this observation. Casual dress is a facially race-neutral reason for exercising a strike, and courts have noted that prosecutors may regard a juror's dress as some indication of how seriously he or she takes the responsibility of serving as a juror. (See, e.g., *People v. Elliott*, *supra*, 53 Cal.4th at pp. 569–570; *U.S. v. Thompson* (9th Cir. 1987) 827 F.2d 1254, 1260.) The record also lends some support to the prosecutor's stated concern about Reginia S.'s views regarding the evidence presented in the O.J. Simpson case; asked on the questionnaire for her feelings about the case, she responded that "[i]f they couldn't prove he murdered Nicole, then the verdict was fair." Similarly, the prosecutor's concern about Reginia S.'s belief that, as she wrote, "the system is not always fair, [and] sometimes race seems to play a part" also finds support in the record. We have previously upheld challenges based on similar reasons. (See, e.g., *People v. Mills* (2010) 48 Cal.4th 158, 184 [upholding as race-neutral the prosecutor's stated concern about a prospective juror's belief that the prosecution in the O.J. Simpson murder trial had not proved Simpson's guilt]; *People v. Winbush* (2017) 2 Cal.5th 402, 439 ["Skepticism about the fairness of the criminal justice system

17

to indigents and racial minorities has also been recognized as a valid race-neutral ground for excusing a juror."].)[3]

But other reasons given for challenging Reginia S. either lack record support or do not withstand comparison to the prosecutor's treatment of other jurors. The prosecutor asserted that he challenged Reginia S. in part because her brother had been found guilty of several minor theft offenses when he was younger. But as defendant points out, Reginia S. wrote in her questionnaire that she felt her brother had been treated fairly, and the prosecutor later declined to challenge two alternate jurors who had close relatives who were convicted of various crimes. The record suggests that the prosecutor's concern with prospective jurors' stability was a general one, not limited to members of any racial group. But the prosecutor's stated concern about Reginia S.'s stability is questionable in light of her questionnaire responses showing that, at age 38, she had been married for 11 years and had had only two employers (for one of whom she had worked 11 years). Finally, despite acknowledging at one point he had failed to notice Reginia had a bachelor's degree from Pepperdine University, the prosecutor later referred to her education as "limited"—an inapt characterization,

---

[3] Defendant points out that the prosecutor did not challenge Jurors Nos. 317 and 353, who expressed somewhat similar views. But these jurors' questionnaire responses differed from Reginia S.'s in ways the prosecutor could well have regarded as significant. Like Reginia S., Jurors Nos. 317 and 353 checked "No" in response to the question whether Blacks were treated as fairly by the judicial system as other persons. But of the three, only Reginia S. responded to an open-ended question about problems with the criminal justice system by spontaneously raising questions about the system's fairness and the role race plays in it. In response to the question asking whether they were upset by the O.J. Simpson verdict, both Jurors Nos. 317 and 353 checked "Yes" and explained the jury had not deliberated long enough. Reginia S., by contrast, checked "No" and explained, as discussed earlier, that the verdict was fair if Simpson's guilt was not proven.

18

particularly considering that, as the trial court remarked, only 12 percent of San Bernardino County residents had college degrees.

The prosecutor's reasons for striking the next challenged juror, Huey D., raise much the same difficulty: While some of the reasons were supported in the record, others were not. We will review the record concerning the challenge of Huey D. before addressing the trial court's rulings as to both prospective jurors.

### c. Prospective Juror Huey D.

In explaining his decision to strike Huey D., the prosecutor first mentioned that Huey D. was 70 years old, that his opinions were "extremely confused," and that his opinions were "extremely weak" with respect to "the death penalty and . . . the status of crime in the community," and "he put great emphasis on the fact that he felt the standard of proof on the death penalty should be no doubt." After looking at his notes, the prosecutor added that Huey D. had given answers to questions about the O.J. Simpson case that were "pro O[.]J[.] and anti prosecution." He also expressed concern about Huey's views on individual responsibility and why people commit crimes, and reiterated his concern over Huey D.'s views on the death penalty. After a recess, the prosecutor observed that Huey D. made "various statements ending with, I also feel that care should be used in sentencing someone to death. There should be no doubt." The prosecutor also noted that Huey D. did not answer a question asking whether his feelings about death were such that he would never be able to vote for death, instead explaining that he had problems about how the question was asked. He also expressed concern that Huey D. had written that he had no opinion about recent crimes covered in the news (which included the Simpson case) and that he could not think of ways to improve the criminal justice system. In the prosecutor's view, these views were surprising for a person who, like Huey D., was an educator with a master's degree. Regarding the Simpson case in particular, the prosecutor stated,

19

Huey had answered that the verdict did not upset him because he felt there was doubt.

During the ensuing discussion, the prosecutor explained he was attempting to pick a "well working, cohesive group" of jurors and was concerned with whether prospective jurors "have any experiences working with leaders and as followers or working as a group." When the trial court noted that Huey D. had been a high school principal, the prosecutor replied: "I went through his particular questions. It is not difficult to see why he is no longer in this group. He is not a person involved in the community. He is not involved in any community activity. He is completely devoid of opinions concerning some of the hot issues in the community today. He is a person who showed confusion by defense counsel's own admittance, that he was not too aware of what was going on. I don't know if that was as a result of his age, which is 70 years old, and I don't know. Again, why take that risk when there are other people whom I've evaluated who are a better fit within the total group?" In response, defense counsel asserted that Huey D. was currently "a member of several organizations that are community-based. The South Area Bay Club [*sic* Boys Club], the Parent Teachers Association, and the Omega Psi Phi Fraternity." The prosecutor asked whether Huey was currently a member of these organizations, an apparent reference to Huey's questionnaire, which states that, except for the fraternity, he had not been a member of these organizations for several years.

As previously noted, the trial court concluded that the prosecutor challenged Huey D. because he feared that, like Reginia S., Huey D. would not vote to impose the death penalty unless the evidence of guilt was more compelling than proof beyond a reasonable doubt. Huey D.'s questionnaire answers and testimony provide substantial evidence supporting this conclusion. When asked to describe his general feelings about the death penalty, Huey wrote: "I feel that the

20

death penalty does have a place in the system. It may or may not deter crime but I feel that without it, crime could be worse. I also feel that care should be used in sentencing someone to death. Their [*sic*] should be no doubt." When asked whether he had positive or negative feelings about the death penalty, Huey reiterated the point: "I feel that the death penalty should be used in extreme cases where their [*sic*] is no doubt." When asked whether he would be reluctant to personally vote for a sentence of death, he answered yes.

On voir dire, Huey D. stated his view that the death penalty "has its place" and he would support it "if the proof is conclusive that this is what is necessary." And he thereafter agreed with the prosecutor that on the "part of this case that may deal with the death penalty" he "would want absolute proof." When the prosecutor informed him that the prosecution need only present proof beyond a reasonable doubt, not absolute proof, and asked whether he could accept this standard, Huey D. said he could. Nevertheless, it is not surprising that the prosecutor believed that Huey D.'s views on the degree of proof required to impose a death sentence made him a less than ideal juror for the prosecution. As with Sandra D. and Reginia S., defendant argues that the prosecutor declined to challenge several jurors and alternates whose views on the death penalty were similar to those of Huey D. But as previously noted, none of the jurors or alternates repeatedly expressed the view that they would require "absolute proof" of the defendant's guilt. The trial court did not err in crediting the explanation.

Some of the other reasons the prosecutor gave for challenging Huey D. also find support in the record. As the prosecutor noted, Huey had indicated in his questionnaire that he was not troubled by the decision in the O.J. Simpson case, writing: "I felt that their [*sic*] was doubt." Huey also declined to answer a number of questions seeking information about his attitudes toward the death penalty. For example, when asked whether his feelings about the death penalty were such that

21

he would never be able to vote for the death penalty, he did not answer, instead writing: "I really have problems as to how this question is asked." He answered other sentencing-related questions "I really do not know," "Have no opinion now," or "No clear opinion."

Reasonable minds might not share the prosecutor's view that Huey D.'s lack of an opinion about whether the death penalty was used frequently enough and his inability to think of ways to improve the criminal justice system were causes for concern. But the record provides no adequate basis for us to conclude that the prosecutor's reasons were a pretext for discrimination. Defendant points to other jurors who were not challenged on similar grounds. Although some of these jurors declined to give substantive responses to one or two questions, only one—Juror No. 87—declined to answer multiple questions probing attitudes toward the death penalty. Juror No. 87's views were, however, nevertheless clear: Among other things, Juror No. 87 indicated that she believed that "violent crime murder" should "[a]lways receive the death penalty"; that the State should impose the death penalty on anyone who kills another human being for any reason; and that she "[s]trongly favor[ed] the death penalty" and had actively supported the 1978 Briggs Initiative reinstating capital punishment in California. As previously noted, Huey D.'s questionnaire and voir dire responses did not paint a comparably clear picture about his views on the death penalty.[4]

---

[4] Defendant argues the prosecutor's focus on Huey D.'s age (70) suggests pretext because Huey had no health problems that would interfere with his service as a juror. But the prosecutor mentioned the prospective juror's age as possibly explaining his omitted and vague answers on the questionnaire, not in reference to potential physical limitations. As explained above, the record provides sufficient support for the prosecutor's concern regarding Huey's questionnaire responses.

On the other hand, the prosecutor's claim that Huey D. would not be a good member of a cohesive jury because he "is not a person involved in the community" rings false in light of the facts that Huey, a 70-year-old retired teacher, principal and school administrator, was still involved in a fraternity promoting scholarship and leadership, had been in a parent-teacher association for almost 40 years (ending seven years before trial), had supervised a Sunday school and at earlier periods of his life was active in other youth-support organizations—all experiences that likely involved both leadership and working in groups. Again, the record suggests that the prosecutor's interest in community involvement was not limited to members of any racial group, but it is unclear why Huey D.'s questionnaire responses would have raised particular concerns. The prosecutor's complaint that Huey wrote he had a problem with the way one of the death-penalty questions was asked is undermined by the fact that jurors and alternates, whom the prosecutor did not peremptorily challenge, also questioned or criticized aspects of the lengthy, somewhat repetitive juror questionnaire.[5] And the prosecutor's assertion that Huey's answers regarding the reasons for crime and how it should be handled showed a bias against law enforcement are not borne out by the record: Huey's responses on these questions—that crime had increased due to "lack of jobs and proper supervision for youth" and that, to alleviate crime, communities should receive more resources for resolving these problems—appear to reflect his

---

[5]     In colloquy with one prospective juror who found the questionnaire's death-penalty section hard to follow because of its repetitiveness, the prosecutor remarked that it was "purposely" written "[t]o see if we can confuse people." He was no doubt joking, but the remark nonetheless undercuts his claimed concern with Huey D.'s statement that he had a problem with the wording of one question. (This prospective juror was excused for cause, without defense opposition, because of his categorical inability to impose the death penalty.)

commitment to educating and supporting young people rather than any negative attitude toward police or prosecutors.

As to each of the three prospective jurors who were subjects of the first *Batson/Wheeler* challenge, the prosecutor, when asked for his reasons, identified a relatively long list of questionnaire responses and other factors to justify the challenge. In each case, the trial court identified what it regarded as a central nonracial reason for the challenge—Sandra D.'s deep reluctance to impose the death penalty and Huey D. and Reginia S.'s insistence on a heightened standard of proof before imposing the penalty—and found the prosecutor sincere in offering that reason for the challenge.**6** This "laundry list" approach (*Foster v. Chatman* (2016) 578 U.S. ___, ___ [136 S.Ct. 1737, 1748]) carries a significant danger: that the trial court will take a short-cut in its determination of the prosecutor's credibility, picking one plausible item from the list and summarily accepting it without considering whether the prosecutor's explanation as a whole, including offered reasons that are implausible or unsupported by the prospective juror's questionnaire and voir dire, indicates a pretextual justification. A prosecutor's positing of multiple reasons, some of which, upon examination, prove implausible or unsupported by the facts, can in some circumstances fatally impair the prosecutor's credibility. (See *U.S. v. Chinchilla* (9th Cir. 1989) 874 F.2d 695, 699 [where two bases for the challenges were acceptable and two were not, appellate court holds motion under *Batson* should have been granted: "the fact that two of the four proffered reasons do not hold up under judicial scrutiny militates against

---

**6** The prosecutor's approach here may have resulted from a degree of miscommunication between court and counsel. During discussion on defendant's motion, the court asked the prosecutor to "[c]over everything that you think is important," an invitation the prosecutor took as calling for "every single detail" about the disputed challenges.

[the supported reasons'] sufficiency"].) In assessing credibility at the third stage of a *Batson/Wheeler* decision, trial courts should attempt to evaluate the attorney's statement of reasons as a whole rather than focus exclusively on one or two of the reasons offered.

In this case, however, the record contains no indication that the trial court took any short cut in evaluating the prosecutor's credibility. Rather, the trial judge expressed substantial concerns about the prosecutor's challenges, which had eliminated all the Black jurors in a case involving a Black defendant and defense counsel. The court engaged actively in the third-stage analysis, questioning counsel closely on certain points. True, after hearing the prosecutor's presentation and defense counsel's rebuttal, the trial court focused on Reginia S. and Huey D.'s statements about a heightened standard of proof, accepting that as the prosecutor's motivation for those challenges. At the same time, however, the court expressly allowed further discussion on the propriety of the strikes, and further discussion indeed ensued. The court expressed skepticism as to the prosecutor's assertion that Reginia S. and Huey D. possessed insufficient education, community involvement, or leadership ability to function as part of a "well working, cohesive group," noting that Reginia S. was better educated than many residents of the county and Huey D. had been a high school principal. After further argument from both parties, the court in conclusion stated that while it might not have exercised peremptory challenges in the same manner, it continued to find the prosecutor had not exercised them with a racially discriminatory motivation. Despite its skepticism as to certain of the offered reasons, the court's overall assessment of the prosecutor's credibility remained unchanged.

That the trial court did not address in detail each of the numerous reasons the prosecutor gave for excusing Reginia S. and Huey D. does not mean it failed to make a sincere and reasoned evaluation of the prosecutor's reasons overall. A

sincere and reasoned evaluation of the prosecutor's stated reasons does not, in every circumstance, require the court to make detailed comments on every such reason.  (*Hamilton*, *supra*, 45 Cal.4th at p. 901.)  But the court should determine whether the challenge was based on group bias by considering the reasons as a whole, without focusing on a single stated reason to the exclusion of others.  The record indicates the trial court here properly considered the prosecutor's statement of reasons as a whole, and we therefore give the lower court's credibility finding the deference due a sincere and reasoned evaluation.

### d.  *Prospective Juror Elizabeth K.*

The prosecutor gave a lengthy explanation for his challenge to Elizabeth K., occupying fully 10 pages of transcript.  The prosecutor said that because Elizabeth K. had "considerable experience as a leader" and "a tremendous amount of group ability," she was likely to be the jury foreperson (the defense having assertedly "knock[ed] out [his] leaders"), but her questionnaire answers indicated that she was likely to vote for life imprisonment without possibility of parole and to persuade other jurors to do the same.  He explained that he had a system by which he rated the prospective jurors, that he had rated Elizabeth K. a "C minus" because of her views on the death penalty, and she was the only C minus juror remaining on the panel.  He said he had asked a supervising deputy district attorney who had tried death penalty cases, and who used a similar grading system, to read her answers pertaining to the death penalty, and he gave her the same grade.

The prosecutor explained that certain of Elizabeth K.'s answers seemed disingenuous.  He noted that when asked what the criminal justice system's biggest problems were and how they could be improved, Elizabeth K. said she had not thought about it and had not had much interaction with the criminal justice system.  He had difficulty crediting this answer because Elizabeth had been on the board of directors of a spousal abuse home.  Elizabeth also wrote that she had not

26

followed the O.J. Simpson case, which the prosecutor found difficult to believe both because of her involvement in spousal abuse issues and because Elizabeth's husband had been a professional football player who knew Simpson. When asked whether her feelings about the death penalty had changed in the last 10 years, Elizabeth said she had " 'never taken a position on it one way or the other.' " The prosecutor found it unlikely that a person with her experiences and education would have no opinion on the issue.

The prosecutor was troubled that, when asked to describe her feelings about the death penalty, Elizabeth K. wrote: " 'In general, I do not believe people should decide who gets to live and who has to die. However, I do believe there are times that this difficult choice has to be made. It should not be taken lightly.' " And when the questionnaire asked whether she believed in "an eye for an eye," Elizabeth said she did not, commenting that "[t]wo wrongs don't make a right." The prosecutor interpreted that comment as expressing the view "that anything that had the possible taint of revenge or the use of the death penalty because some crime deserved it was not appropriate." When asked whether she had a positive or negative feelings about the death penalty, Elizabeth said she viewed it "as a part of our society's system that we unfortunately have to deal with periodically." The prosecutor acknowledged that this answer was not "completely negative," but he found it "very weak, and certainly the weakest on the present panel." The prosecutor was also disturbed that, when asked for her general thoughts about the benefit of imposing a death sentence on a person convicted of special circumstances murder, she wrote: " 'I don't see a benefit in sentencing anyone to death. I just don't think of it in those terms.' " In the prosecutor's view, this answer was "the ultimate capper in placing her in the negative side of the death penalty issue." Finally, when Elizabeth K. was asked whether she could show mercy to a person guilty of intentional murder, she wrote: " 'If by "mercy," . . .

you mean grant a less harsh sentence, I could, if there were circumstances to warrant it.' " The prosecutor viewed this answer as "pure game playing," explaining "I think she is equivocating, trying to conceal her true feelings."

The prosecutor concluded: "My interpretation of her true feelings were that she is likely to vote for life imprisonment without the possibility of parole, except in very extreme cases, and only if there are other jurors who could interact with her to lead her to that approach. . . . [W]ith the present group on the panel . . . I simply do not feel that that's possible. I think that she would, in fact, lead at least four of the other jurors, to her present position."

The trial court found that the prosecutor excused Elizabeth K. because of "her stand on death penalty issues." The court agreed with the prosecutor that Elizabeth K. was likely to be the jury foreperson, describing her as "extremely qualified." And after reviewing Elizabeth's answers, the court found that the prosecutor "could reasonably believe that she was extremely reluctant . . . to [impose] the death penalty." In the court's view, the prosecutor reasonably believed that Elizabeth was intelligent and open-minded, and could be talked out of her opinions by other persuasive jurors, but "if you put her on a jury in the absence of other leadership, . . . I think I'm hearing him say that . . . her reluctance to impose the death penalty wouldn't be disputed by anybody, and I think he could rationally conclude that she's reluctant to impose the death penalty . . . ." The court reasoned that the prosecutor's decision to pass the challenge several times with Elizabeth on the panel was consistent with this view. Summing up, the court explained: "[T]he question is, as I sit here, do I believe what [the prosecutor] says or do I think that he is doing things for racial purposes? And I think if he was doing it just for racial purposes he would have done it much sooner. . . . [I]t really does suggest to me . . . [t]hat he saw her as being resistant to the death penalty,

28

probably would go along with it . . . . [¶] But now she is going to be the leader . . . and he feels that that's a risk he can't take. I believe [the prosecutor] on that."

Defendant argues that the prosecutor deliberately waited to challenge Elizabeth K. until the defense had passed the challenge, which signaled to the prosecutor that this was his last chance to strike her and thereby to ensure that the jury contained no Black jurors. But as the trial court noted in rejecting the same argument, this scenario is improbable: From the prosecutor's point of view, it was entirely possible that the defense could have passed after any of the three times that the prosecutor passed the challenge. If that had happened, Elizabeth K. would have remained on the jury. The timing of the challenge supports the trial court's conclusion that the strike was not motivated by Elizabeth K.'s race, but instead by the prosecutor's evaluation of the dynamics of the jury following a series of defense strikes.

Defendant also argues that the prosecutor's stated concerns about juror dynamics were pretextual. He points out that the prosecutor did not challenge Jurors Nos. 46, 119, and 370 and Alternate Jurors Nos. 389 and 91, each of whom, as previously discussed in connection with the other Black jurors challenged by the prosecutor, expressed some reluctance to vote for death. But the trial court found that the prosecutor's concern was not only that Elizabeth K. had somewhat mixed feelings about the death penalty, but that she was likely to assume a leadership role in the absence of other leaders. The trial court agreed with the prosecutor that Elizabeth K., a regional personnel director for a major corporation who had a bachelor's degree in management and whose children were in college, would have been "the probable foreperson." Although the other jurors to whom defendant points all revealed some degree of hesitation about imposing the death penalty, none had the kind of background or leadership experience that Elizabeth

29

K. had, and the prosecutor may have believed that they would have less influence on the jury's deliberations.

It is by no means clear that Elizabeth K. would have persuaded other jurors not to return a death verdict. None of her answers reflected an explicit opposition to the death penalty or a strong reluctance to impose it; some of the answers cited by the prosecutor appear innocuous from the prosecution perspective. Although the prosecutor viewed some of her answers as disingenuous and found other answers suggestive of an anti-death bias, others might infer from those same answers that she was open-minded and would review the evidence fairly and even-handedly. But the trial judge, who was present in the courtroom, credited the prosecutor's explanation. The judge noted that, when he was trying death penalty cases some decades before, answers like Elizabeth K.'s would have been considered "clear over on the right end of the political spectrum," but "now I think it's not unreasonable for the prosecution to assume that somebody with answers like this is certainly left of center" on the death penalty. Our task is not to determine whether we would have shared the prosecutor's concerns; the only question before us is whether substantial evidence supports the court's ruling that the prosecutor described legitimate reasons for the challenge and that he challenged Elizabeth K. for those reasons, not because of her race. Here, substantial evidence supports the trial court's conclusion that the prosecutor challenged Elizabeth K. for reasons other than her race.

*2.* People v. Gutierrez

Defendant maintains that as in *People v. Gutierrez* (2017) 2 Cal.5th 1150 (*Gutierrez*), the trial court here failed to sufficiently scrutinize the prosecutor's proffered reasons. In *Gutierrez*, we held the deference due a trial court that has made a " 'sincere and reasoned' " evaluation of the prosecutor's reasons at the third stage of a *Batson* motion (*Gutierrez*, at p. 1159) was not applicable when the

30

grounds for the strike offered by the prosecutor and accepted by the court were not self-evident and were not explained at the hearing. We explained: "Some neutral reasons for a challenge are sufficiently self-evident, if honestly held, such that they require little additional explication. . . . Yet when it is not self-evident why an advocate would harbor a concern, the question of whether a neutral explanation is genuine and made in good faith becomes more pressing." (*Id.* at p. 1171.) The trial court in *Gutierrez* had accepted "the 'Wasco issue' "—the prospective juror lived in Wasco but claimed to be unaware of gang activity there—as the prosecutor's reason, but "never clarified why it accepted the Wasco reason as an honest one." (*Ibid.*) "The court may have made a *sincere* attempt to assess the Wasco rationale, but it never explained why it decided this justification was not a pretext for a discriminatory purpose. Because the prosecutor's reason for this strike was not self-evident and the record is void of any explication from the court, we cannot find under these circumstances that the court made a *reasoned* attempt to determine whether the justification was a credible one." (*Id.* at p. 1172.)

*Gutierrez*'s reasoning is inapplicable here; the reasons accepted by the court for striking each prospective juror were either self-explanatory or were explained at the hearing. For reasons already explained, we conclude that the trial court's evaluation of the prosecutor's justifications was sincere and reasoned, and we thus accord deference to its credibility ruling.[7]

---

[7] Defendant maintains that "the prosecutor arguably scattered a couple of ostensibly valid race-neutral grounds for excusing the Black prospective jurors amongst his litany of pretextual race-neutral grounds." He argues that the trial court therefore should have applied a mixed motives analysis borrowed from other legal contexts. (See, e.g., *Hunter v. Underwood* (1985) 471 U.S. 222, 228; *Arlington Heights v. Metropolitan Housing Corp.* (1977) 429 U.S. 252, 270 & fn. 21; *Howard v. Senkowski* (2d Cir. 1993) 986 F.2d 24, 30.) But the trial court did not find that the prosecutor's strikes were motivated by a combination of race-

*(footnote continued on next page)*

31

## B. Guilt Phase Issues

### 1. *Trial court's failure to instruct on lesser included offenses of second degree murder and voluntary manslaughter*

Defendant argues that the trial court erred by not instructing the jury sua sponte on second degree murder and voluntary manslaughter, which are lesser offenses necessarily included within the charged crime of first degree murder. He asserts that its failure to do so violated his rights to a fair trial, to due process of law, and to reliable guilt and special circumstance verdicts as guaranteed by the federal and state Constitutions.

As a general rule, "a trial court errs if it fails to instruct, sua sponte, on all theories of a lesser included offense which find substantial support in the evidence." (*People v. Breverman* (1998) 19 Cal.4th 142, 162.) But a court must instruct on such theories only when the record contains " ' "substantial evidence" from which a rational jury could conclude that the defendant committed the lesser offense, and that he is not guilty of the greater offense.' " (*People v. Whalen* (2013) 56 Cal.4th 1, 68 (*Whalen*).)

Here, defendant's claim that the trial court should have instructed on second degree murder fails at the outset because defendant himself asked the court not to give the instruction at trial. "[A] defendant may not invoke a trial court's failure to instruct on a lesser included offense as a basis on which to reverse a

*(footnote continued from previous page)*

based and race-neutral considerations; it instead found that the strikes were based on considerations other than race. Because we uphold that finding, we have no occasion to consider what result would obtain if the prosecutor's challenges were based in part on race-neutral reasons and based in part on group bias. We therefore need not decide here whether mixed motives analysis applies in a *Batson/Wheeler* case. (See generally *Hamilton*, *supra*, 45 Cal.4th at p. 909, fn. 14; *People v. Schmeck* (2005) 37 Cal.4th 240, 275–277.)

conviction when, for tactical reasons, the defendant persuades a trial court not to instruct on a lesser included offense supported by the evidence." (*People v. Barton* (1995) 12 Cal.4th 186, 198.) Defense counsel in this case asked the court not to instruct on second degree murder; he said he had discussed the matter with defendant, and defendant personally joined in the request on the record. Defendant thereby invited the alleged error of which he now complains.

By contrast, defense counsel never asked the court not to instruct the jury on voluntary manslaughter, although counsel did agree with the court's observation that the evidence did not warrant it. Defense counsel was correct on this point. As explained below, regardless of whether defendant adequately preserved the issue for appeal, the court was right not to instruct on either second degree murder or voluntary manslaughter, because the evidence at trial would not have supported a jury finding that he was guilty of one of those crimes but not first degree murder.

Defendant argues that the jury could have found that he killed Rexford with express malice (i.e., with the intent to kill), but that he lacked premeditation and deliberation, and that the killing therefore was second degree murder. "In the context of first degree murder, ' "premeditated" means "considered beforehand," and "deliberate" means "formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action" ' " (*People v. Lee* (2011) 51 Cal.4th 620, 636.) "The process of premeditation and deliberation does not require any extended period of time. 'The true test is not the duration of time as much as it is the extent of the reflection.' " (*People v. Mayfield* (1997) 14 Cal.4th 668, 767 (*Mayfield*).)

Defendant points out that there was evidence that he wanted to talk to a person named "Josh," who, he asserts, might not have been Josh Rexford. He notes that Linda Farias testified that, several days before the murder, she

overheard defendant conversing with three other men, during which they said that "Brian" killed Farias, that "Josh" was Brian's cousin, and that "they were going to get through [Josh] to find" Brian, but she heard no last names mentioned. A reasonable juror, he argues, "could easily have concluded that [defendant] sought out a 'Josh' to get information from him, not to kill him," and thus that the killing was unpremeditated. But the jury could have believed that defendant was looking for a "Josh" with an unknown last name only if it rejected Troy Holloway's testimony that defendant questioned him about Josh Rexford within a day or two of the conversation overheard by Farias.

And more significantly, the evidence of the manner of killing cannot be reconciled with defendant's theory that the jury could reasonably have concluded that he was merely seeking information. According to prosecution witnesses, defendant staked out the apartment complex and, just before the shooting, secreted himself in an apartment above Pupua's. He then went downstairs, entered Pupua's apartment, and began shooting immediately, without saying a word. The defense, in turn, relied on defendant's testimony that his kidnappers brought him against his will to Pupua's apartment and staked out the apartment prior to the shooting, and that defendant then entered the apartment with his Hispanic male kidnapper, who immediately started shooting. These are, of course, two very different versions of events, but neither version would have supported a jury finding that defendant committed the murder with express malice but without premeditation. There is nothing in the record that could have led a reasonable juror to believe that defendant planned to converse with the victims or that he actually conversed with them before or after the shooting. In short, "the entire course of conduct clearly revealed by the evidence, taken as a whole, is inconsistent with any suggestion that," if defendant committed the shooting with express malice, "the killing[]

34

[was] not willful, premeditated, and deliberate." (*People v. Carter* (2005) 36 Cal.4th 1114, 1184–1185.)

Defendant argues that the jury could have convicted him of second degree murder by finding that he killed Rexford without premeditation or express malice, but with implied malice. "Malice is implied when the killing is proximately caused by ' "an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life." ' " (*People v. Knoller* (2007) 41 Cal.4th 139, 152.) Here, defendant maintains, the jury could have found that he "knew that his act[ions] endangered the lives of the apartment occupants" but merely "intended to frighten the apartment occupants." He again relies on the testimony that, several days before the shooting, he was overheard saying he "would get through [Josh] to find Brian," as well as the fact that the surviving victims of the shooting did not testify that the gun was pointed at Rexford in particular, as opposed to all three victims. But defendant fired between seven and 16 bullets over the course of 30 to 45 seconds. No fewer than five of those bullets struck Rexford. Based on this evidence, the jury could not reasonably conclude that defendant was simply trying to frighten Rexford.

Defendant places significant weight on Badibanga's testimony that defendant's gun was pointing "upwards," arguing that this was substantial evidence that he fired recklessly or with gross negligence, not with a premeditated intent to kill. But defendant takes the word "upwards" out of context. Badibanga testified that when defendant first stepped into the apartment, he was "bringing [his] gun up," "[s]o it wasn't to his hip or side[,]" and that "it was kind of going *upwards* . . . but almost pointed forward." Badibanga turned away before defendant began shooting. This is not substantial evidence that defendant was firing randomly or blindly in an upward direction.

35

Defendant argues that the trial court should have instructed the jury that it could convict him of second degree murder under the second degree felony-murder rule, based on the theory that he killed Rexford in the commission of discharging a firearm in a grossly negligent manner, a felony. (Pen. Code, § 246.3.) But after defendant filed his opening brief, we held that a second degree felony-murder conviction may not be based on a violation of section 246.3. (*People v. Chun* (2009) 45 Cal.4th 1172, 1200.)

Nor was defendant entitled to an instruction on second degree murder based on the theory that he aided and abetted an assault with a firearm, and that second degree murder was a natural and probable consequence of that offense. (See *People v. Prettyman* (1996) 14 Cal.4th 248.) On the prosecution's version of events, defendant was the shooter; on defendant's version, he was brought to the apartment against his will by kidnappers. Neither version of events would have supported a conclusion that defendant was liable for second degree murder on an aiding and abetting theory.

As for defendant's contention that the trial court should have instructed the jury on the lesser included offense of voluntary manslaughter, we see no evidence that would have supported such an instruction. Defendant points out that a neighbor of Pupua who did not see the shooting testified that after it he overheard someone say, " 'I couldn't get to my gun.' " The neighbor did not know who made the statement because "a group of people in front of the apartment . . . were milling around" when he heard the comment. Defendant argues that this testimony, coupled with evidence that, within two days of Rexford's death, Pupua and Rexford were involved in a fight at a football game and Pupua was peripherally involved in a fight at his own apartment, required the court to instruct on voluntary manslaughter, based either on the theory that defendant was

36

provoked and shot Rexford in the heat of passion or on the theory that he shot Rexford in imperfect self-defense.

But none of the evidence cited by defendant in any way suggests that the victims engaged in provocative conduct before the shooting began, or that defendant was subjectively roused to "the actual influence of a strong passion" (*People v. Wickersham* (1982) 32 Cal.3d 307, 327)—i.e., a " ' "[v]iolent, intense, high-wrought or enthusiastic emotion" ' " (*ibid.*)—at the time of the shooting. The evidence therefore did not support an instruction on voluntary manslaughter arising from the heat of passion. Nor does the evidence in any way suggest that before the shooting began, the victims did anything that could have caused defendant to believe that he had to shoot Rexford (or anyone else) to " 'defend against imminent peril to life or great bodily injury' " (*People v. Elmore* (2014) 59 Cal.4th 121, 134), and there was no evidence that defendant had the requisite " 'actual belief' " (*ibid.*) that he needed to shoot Rexford for this reason. Thus, there was no evidentiary basis for an instruction on voluntary manslaughter arising from imperfect self-defense.

Defendant argues that, by failing to instruct on any lesser included noncapital offenses, the trial court gave the jury an all-or-nothing choice between the capital charge and acquittal, in violation of the Eighth and Fourteenth Amendments to the federal Constitution. (See *Beck v. Alabama* (1980) 447 U.S. 625.) But "*Beck*'s principles [are] satisfied if the jury was provided some noncapital third option between the capital charge and acquittal. Here the jury was provided with the noncapital option of first degree murder without special circumstances." (*People v. Sakarias* (2000) 22 Cal.4th 596, 621, fn. 3; *People v. Horning* (2004) 34 Cal.4th 871, 906.) And in any event, as defendant acknowledges, "the constitutional requirement that capital juries be instructed on lesser included offenses extends only to those lesser included offenses supported

by substantial evidence." (*People v. Duff* (2014) 58 Cal.4th 527, 562 (*Duff*), citing *Schad v. Arizona* (1991) 501 U.S. 624, 648; *Beck*, *supra*, at p. 627.) Here there was no substantial evidence that defendant did not commit first degree murder but did commit one of the lesser included offenses on which, he asserts, the jury should have been instructed.

### 2. *Admissibility of Troy Holloway's out-of-court statements and trial testimony*

In March 1995, more than four months after the murder, Detective Frank Gonzales interviewed Troy Holloway about events following the murder. Holloway told Gonzales that the night after he found out that his friend Rexford had been killed, he bought a nine-millimeter pistol from Steve Blackshire for $70. He said he did not ask who had originally owned the gun, but he threw it into a wash three or four days later because he decided he did not need it, and he threw the bullets that had been in the gun into a field "by the tracks."

Two years thereafter, after defendant's first trial had begun,[8] Detective Scott Franks located Holloway, who was stationed on a naval vessel in Virginia. He asked naval officers to allow him to speak with Holloway, explaining that Holloway was a possible witness to a crime. Two Navy petty officers brought Holloway to a room, told him to call Franks, and remained present during the ensuing telephone conversation.

In the conversation, Detective Franks told Holloway he was "in no trouble now," but he needed to "be totally honest." Franks said the judge "is really P.O.'d about what's been going on," and "he's ordered me to . . . report back to him and

---

[8] At the first trial, the prosecution attempted to introduce evidence that it had discovered after the trial had begun, as well as evidence described in an earlier police report that had not been provided to the defense. The trial court granted the defense's motion for a mistrial.

he's gonna make a determination whether or not I have to call" Holloway's commanding officer and have Holloway taken into custody, in which case Holloway would be brought before the judge to "tell . . . the truth or . . . [be held] . . . in contempt of court." Several times during the conversation, Detective Franks repeated that Holloway risked being held in contempt if he did not tell the truth, although the trial court had never indicated to Franks that he was "really P.O.'d" or that Holloway might be held in contempt. At one point in the conversation Holloway indicated that he was not alone—i.e., that he was speaking in the presence of naval officers—and that he was worried about being killed. Franks responded, "you can be a cooperative witness or you can be in handcuffs."

Holloway eventually said he would tell Detective Franks the truth. He then admitted that defendant, not Blackshire, had given him the gun and that he had returned it to defendant about two days thereafter. He also said that before the murder, defendant had asked him where Josh Rexford lived and where he hung out.

Defendant moved to bar Holloway from testifying and to exclude his statement to Detective Franks, arguing that Franks improperly used coercive techniques to elicit Holloway's telephone statements. The trial court denied the motion, and Holloway testified for the prosecution. Defendant now argues that, by allowing Holloway to testify and admitting his out-of-court statements to Detective Franks, the court violated defendant's rights to due process, to a fair trial, and to a reliable determination of guilt, as guaranteed by the United States and California Constitutions.

Although the transcript of Holloway's second interview was used by the prosecutor to refresh Holloway's memory on one point and by defense counsel to impeach his testimony on another, defendant does not assert that the interrogation tape was played for the jury or the transcript shown to them, and we have found no

39

record of either event. For this reason, we focus on defendant's claim that the court erred in admitting Holloway's trial testimony in light of the asserted police coercion during the March 21, 1997, interview.

"A defendant may assert a violation of his or her own right to due process of the law and a fair trial based upon third party witness coercion . . . if the defendant can establish that trial evidence was coerced or rendered unreliable by prior coercion and that the admission of this evidence would deprive the defendant of a fair trial." (*People v. Williams* (2010) 49 Cal.4th 405, 452–453, italics omitted.) The defendant must show that improper coercion "directly impaired the free and voluntary nature" of the evidence offered at trial. (*People v. Boyer* (2006) 38 Cal.4th 412, 444; see also *United States v. Juan* (9th Cir. 2013) 704 F.3d 1137, 1142 ["the government's substantial interference with the testimony of its own witnesses can violate the Due Process Clause"].)

While urging Holloway to be honest and tell the truth, Franks also made plain the police believed, on the basis of others' statements, that defendant had given Holloway a nine-millimeter pistol on the night of Rexford's killing. Threats of punishment for failure to conform a statement to the police theory, such as Franks made here, may constitute coercion and, under some circumstances, produce an unreliable statement. Whether they did so here is uncertain. The transcript of Holloway's interview with Franks also includes several exchanges in which Holloway discussed his fear of retribution if he pointed the finger at defendant and Franks sought to reassure him, gain his trust and motivate him to do the right thing by testifying against defendant.[9] It is not at all clear whether

---

[9] Franks told Holloway he believed Holloway was afraid of being killed; later Holloway admitted his fear and asked how Franks knew. Holloway went on to say that defendant "is a man that would come kill your ass. Why do you think I

*(footnote continued on next page)*

Holloway changed his story during the March 21 interview because he feared being held in contempt by the judge or because, having wanted all along to tell the truth about the murder of his friend, he only then overcame his fear of defendant.

Defendant points out that Holloway was supervised by military personnel during the telephone interview, and argues that members of the armed forces may face pressure to comply under circumstances where an ordinary citizen would not feel coerced. The United States Court of Military Appeals has recognized that a servicemember "may be especially amenable to saying what he thinks his military superior wants him to say—whether it is true or not." (*United States v. Armstrong* (U.S.C.M.A. 1980) 9 M.J. 374, 378.) But here there is no reason to believe that Holloway was trying to please his superiors when he made his statement to Detective Franks. Nor is there any reason to believe that Holloway's commanding officer had an opinion about what Holloway should say. The petty officers who were present during Holloway's telephone interview had not been given any specific information about Holloway's prior statement to Detective Gonzales. They were simply told that the police "were looking at [Holloway] . . . as a witness to a crime." Beyond their mere presence, there is no indication that they expressly or impliedly pressured Holloway at any time during the interview.

Defendant argues that Detective Franks's statements constituted an improper and coercive offer of leniency to Holloway. But Franks never gave any

---

*(footnote continued from previous page)*

been holding off so long?" Franks appealed to Holloway to stand up for the victim, his friend. Eventually, Holloway said that though he was "[p]etrified that this man was going to kill me," he "could not sleep with this shit on my conscious any more." Near the interview's end, Holloway asked for "protective custody" and Franks promised to "take care of you."

41

indication that Holloway was in danger of being charged with a crime, and the only promise of leniency he extended was the implicit promise that Holloway would not be held in contempt if he cooperated and testified truthfully. Even if we assume for the sake of argument that this promise was improper, "the case law fails to support defendant's premise that a third party witness's statements are rendered inadmissible against a defendant if induced by improper offers of leniency." (*People v. Ervin* (2000) 22 Cal.4th 48, 83.) "We have never held . . . that an offer of leniency in return for cooperation with the police renders a third party statement involuntary or eventual trial testimony coerced." (*People v. Badgett* (1995) 10 Cal.4th 330, 354.)

We need not decide whether Holloway's March 21, 1997, statement was the product of coercion, as the record contains no evidence that any such coercion extended to and influenced Holloway's actual testimony. More than two months passed between Holloway's telephone interview with Franks and his testimony at defendant's trial. There is no evidence that in the interim Holloway sought to disavow his statement or that Franks (or anyone else) threatened him with punishment if he did. At trial, defense counsel cross-examined Holloway about Franks's assertedly coercive conduct in March, suggesting it motivated Holloway's change of story. Holloway responded that he told Franks about defendant's actions because "I decided it was time to tell the truth." Franks's threat "played a part in it, yes, but I still had come to that conclusion." Holloway could have retracted his statement at trial and claimed he was forced to give it; he instead defended it as the truth.

In support of his contention that Franks's coercion "was ongoing at trial," defendant notes that Holloway testified that he was then on "terminal leave" from the Navy, which meant he was "in the process of being discharged." But while Holloway still may have been subject to military authority at the time of his

42

testimony, defendant points to nothing to suggest a threat of military discipline if Holloway did not implicate defendant in his testimony. Defendant also notes that at the close of proceedings the day before Holloway's testimony the prosecutor (outside the presence of the jury) stated he had "sent . . . Officer Franks and Mr. Holloway back to his hotel room." Defendant infers Holloway was being kept "under the supervision of county law enforcement." Given Holloway's March 21 request for Franks's protection, however, no inference of coercive custody arises.

For these reasons, we conclude the court did not err in allowing Holloway to testify. As mentioned earlier, the record fails to show Holloway's March 21 statement was itself introduced in evidence. To the extent it was, however, any error in doing so would be harmless beyond a reasonable doubt in light of Holloway's properly admitted testimony and the testimony of Patrick Wiley and Linda Farias, which corroborated Holloway's in key respects.

### 3. Failure to instruct the jury to consider defendant's admissions with caution

Defendant argues that the trial court committed prejudicial error when it failed to give, sua sponte, CALJIC No. 2.71.7, which states: "Evidence has been received from which you may find that an oral statement of [intent] [plan] [motive] [design] was made by the defendant before the offense with which [he] [she] is charged was committed. [¶] It is for you to decide whether the statement was made by [a] [the] defendant." As he points out, the prosecution, through the testimony of Linda Farias and Troy Holloway, presented evidence of out-of-court, preoffense statements by defendant that tended to show his intent, motive, and planning for the Rexford murder.

The Attorney General concedes in his briefing that the trial court should have instructed the jury to view evidence of defendant's statements with caution. But after the brief was filed, we ruled that a trial court need not, absent a request

43

by the defense, instruct the jury to view a defendant's out-of-court statements with caution. (*People v. Diaz* (2015) 60 Cal.4th 1176, 1181 (*Diaz*).) We declined to decide whether this newly announced rule applies retroactively, however, concluding that any error in that case was harmless. (*Id.* at p. 1195.) We reach the same conclusion here.

We have held that a trial court's failure to give the cautionary instruction is harmless when there is no conflict in the evidence regarding the testimony in question, but "simply a denial by the defendant that he made the statements attributed to him." (*People v. Dickey* (2005) 35 Cal.4th 884, 906.) In *Dickey*, the court did not give the cautionary instruction but did instruct on "the significance of prior consistent or inconsistent statements of witnesses, discrepancies in a witness's testimony or between his or her testimony and that of others, witnesses who were willfully false in one material part of their testimony being distrusted in other parts, weighing conflicting testimony, [and] evidence of the character of a witness for honesty and truthfulness to be considered in determining the witness's believability." (*Ibid.*) It also gave "a general instruction on witness credibility that listed other factors to consider." (*Ibid.*) We found that the defendant was not prejudiced by the court's failure to instruct the jury to view out-of-court statements with caution, noting that the defense "extensive[ly] impeach[ed]" the two prosecution witnesses who testified that the defendant had made out-of-court statements, and that the defense had raised credibility issues pertinent to the omitted cautionary instruction. (*Ibid.*) In light of these facts, we concluded, "the jury was unquestionably aware [the witnesses'] testimony should be viewed with caution." (*Id.* at p. 907.)

Here, the trial court gave the same instructions that were given in *Dickey*, covering prior consistent or inconsistent statements, discrepancies in testimony, a willfully false witness, the weighing of conflicting testimony and the credibility of

44

witnesses generally. As in *Dickey*, defendant simply denied making the statements attributed to him, and defense counsel pointed out the inconsistencies and weaknesses in the testimony of Holloway and Farias.

Defendant argues that here, unlike *Dickey*, there was a conflict in the evidence regarding the statements in question, claiming that prosecution witnesses Farias and Holloway each gave inconsistent testimony describing what they heard defendant say. Whether or not this is true, the details of the statements were not of great import; the real question was whether he made the statements at all. If defendant made the statements, they were circumstantial evidence tending to show that he carefully planned the murder of Rexford; if he did not make the statements, they were not evidence to be considered by the jury. Under these circumstances, as in *Dickey*, any error in failing to give the cautionary instruction was harmless.

### 4. *Challenges to miscellaneous guilt phase*

Defendant argues that certain guilt phase instructions given by the trial court (CALJIC Nos. 2.02, 2.21.2, 2.22, 2.27, 2.51, 2.62, and 8.20) violated his constitutional rights to due process and trial by jury, as well as the requirement of reliability in capital cases, by allowing the jury to convict him based on proof insufficient to satisfy the beyond-a-reasonable-doubt standard.

We have repeatedly held that these instructions do not unconstitutionally lessen the prosecution's burden of proof. (See, e.g., *People v. Pearson* (2012) 53 Cal.4th 306, 326 [addressing all of the instructions except CALJIC No. 2.62].) We decline to revisit our decisions in those cases.

Defendant includes CALJIC No. 2.62 in his list of instructions that he claims undermined the reasonable doubt standard. But he offers no argument or authority stating how or why that instruction affected the prosecutor's burden of proof. Indeed, he cites CALJIC No. 2.62 as an instruction that, unlike another instruction he challenges, correctly states the law. In the absence of supporting

45

argument or authority, we need not consider his challenge to CALJIC No. 2.62. (*Whalen*, *supra*, 56 Cal.4th at p. 72, fn. 28, disapproved on other grounds in *People v. Romero and Self* (2015) 62 Cal.4th 1, 44, fn. 17.)  In any event, the instruction was properly given.  (*People v. Saddler* (1979) 24 Cal.3d 671, 679–680.)

### C.  Special Circumstance Issues

#### 1. *Sufficiency of evidence of prior murder special circumstance*

At the special circumstance phase of trial, the prosecution presented two exhibits—exhibits 24 and 63—for the purpose of proving defendant's alleged prior murder conviction.  The defense presented no evidence.  After deliberating for a short time, the jury found the alleged prior murder special circumstance to be true.  Defendant argues the evidence was insufficient to support the finding.  We begin by describing the two exhibits.

Exhibit 24 contains five pages.  Page 1 is a letter to the San Bernardino Sheriff's Department, the subject of which is "SMITH, Floyd Daniel Jr., YA#: 44591, Sup. Ct. No.:  CR-22000."  The letter states, as relevant:  "Attached are documents showing the commitment under which we held the above named subject . . . .  Also attached are Order of Discharge, fingerprints, and rap sheet.  No photo available. [¶] This is to certify that I, the undersigned, am the official custodian of all records of all wards committed to the Youth Authority, and that the attached documents are true and correct copies of the records in my custody."  The typed name at the bottom of the page is "Patricia A. Hagen, Supervisor, Master Files" but the letter is signed "Kimberley L. Dornback for" Hagen.  The initials "PAH:kld" appear at the bottom of the page, indicating that Dornback is Hagen's secretary.  Page 2 of the exhibit is a minute order from Riverside County Superior Court stating that in case No. CR-22000, People v. Floyd Daniel Smith, the defendant in that case appeared for "pronouncement of judgment" on a

"conviction" on December 4, 1984. Five counts are listed. As relevant here, the minute order describes the charge in count II as "187PC (12022.5 PC) (1st deg)." The order states that the defendant in case No. CR-22000 is "committed to the California Youth Authority . . . for a period of time prescribed by law. (25 years to life plus two years enhancement as to count I [*sic*].)" A box checked on the page indicates that "Plaintiff[]" moved to dismiss counts I, III, IV, and V, but it does not say whether the motion was granted.

Page 3 of the exhibit is an order certifying that defendant was honorably discharged from the California Youth Authority in July 1992. Page 4 is a card from the Federal Bureau of Investigation purporting to show the fingerprints of Floyd Daniel Smith, which states that Smith's "charge" was "PC 187/12022.5 murder, first degree; use of firearm," and the "final disposition" of the charge was "CYA commitment—Riverside County Superior Court." Page 5 is a rap sheet for Floyd Daniel Smith stating that Smith was placed in CYA custody from Riverside County on January 10, 1985, for "187 PC—Murder: first degree—used firearm," that he was paroled on January 22, 1991, and that he was discharged on July 24, 1992.

Exhibit 63 is 17 pages long. Page 1 appears to be a copy of the cover of a folder that contains the Riverside county clerk's record in the case of People v. Floyd Daniel Smith. On this page is a red stamp (described in greater detail, *infra*) stating that the attached pages are true copies of the record in the clerk's office. On the next three pages are a five count information, dated April 9, 1984, charging defendant in case No. CR-22000 with five crimes, count II of which is murder. Following this are four mostly illegible pages showing a complaint and an amended complaint that were previously filed in Mt. San Jacinto Municipal Court in the same case. The next eight pages are minute orders describing appearances

47

by Floyd Daniel Smith in Case No. CR-22000. The last page is the first page of the preliminary hearing transcript in Case No. CR-22000.

Defendant makes three arguments in support of his claim that the evidence of the prior conviction was insufficient, which we address below.

### a. Alleged certification errors

Defendant argues that neither exhibit 24 nor exhibit 63 was properly certified. (See Evid. Code, § 1530.) He points out that exhibit 24 was not signed by the custodian of the records it contains, but by that person's secretary, and there is no evidence that the secretary had custody of the records or the authority to sign the custodian's name. And he notes that exhibit 63 was not actually signed: An unknown person placed a red stamp on the exhibit's first page that states: "This must be in red to be a 'CERTIFIED COPY.' [¶] Each document to which this certificate is attached is certified to be a full, true and correct copy of the original on file and of record in my office." Included in the stamped material is a stamped signature of Arthur A. Sims, Clerk of the Riverside County Municipal and Superior Courts, and what appears to be the seal of those courts.

At trial, defendant did not object to the admissibility of either exhibit, and he does not now claim that the trial court should not have admitted them. Rather, he argues that because the documents were not properly certified, they are not sufficiently reliable to constitute substantial evidence supporting the jury's finding that defendant had a prior murder conviction. We therefore reject the Attorney General's argument that defendant forfeited this claim, which is based on the inaccurate understanding that defendant is arguing, in essence, that the court should not have admitted the exhibits.

"To determine whether the evidence supports a special circumstance finding, we must review ' "the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible,

48

and of solid value such that a reasonable jury could find" ' the special circumstance allegation true ' "beyond a reasonable doubt." ' " (*People v. Becerrada* (2017) 2 Cal.5th 1009, 1028 (*Becerrada*), quoting *People v. Johnson* (2015) 60 Cal.4th 966, 988.) If the exhibits satisfy this standard, they are substantial evidence regardless of whether they satisfied Evidence Code section 1530's requirements for proper certification. Thus, to resolve defendant's claim, we need not decide whether the documents were properly certified.

The letter signed by Kimberley Dornback for Patricia Hagen on the first page of exhibit 24 was embossed with the stamp of CYA,[10] and the red stamp appearing on the first page of exhibit 63 depicts the stamped signature of the court clerk and the seal of the Riverside Municipal and Superior Courts. All of the documents attached to these two cover sheets appear to be official documents. We consider it highly improbable that the attached documents were in fact forgeries, that the person described in them was not convicted, and that some unknown person concocted an elaborate and easily disprovable hoax to frame defendant with a fake conviction. Thus, exhibits 24 and 63 are evidence of reasonable, credible, and solid value (see *Becerrada*, *supra*, 2 Cal.5th at p. 1028), and thus are substantial evidence tending to show that defendant had a prior murder conviction.

*b. Sufficiency of evidence that defendant was the person convicted*

Defendant asserts that the exhibits do not identify him as the person who was convicted. But the exhibits describe the conviction of "Floyd Daniel Smith," and the jury was aware that this was defendant's name. More significantly, exhibit 24 contains a card showing the fingerprints of the convicted person, and at the guilt phase of trial Lita Holober, who worked for the crime scene

---

[10]    The embossment does not appear on the copy of exhibit 24 in the Clerk's Transcript, but it is plainly visible on the exhibit itself.

investigations unit of the San Bernardino Sheriff's Department, testified that the fingerprints on that card were defendant's prints.

Defendant argues that the jury was not permitted to consider Holober's testimony because she testified at the guilt phase of trial, not the special circumstance phase. We disagree. Penal Code section 190.4, subdivision (d), states: "In any case in which the defendant may be subject to the death penalty, evidence presented at any prior phase of the trial . . . shall be considered an [*sic*] any subsequent phase of the trial, if the trier of fact of the prior phase is the same trier of fact at the subsequent phase."[11] Under this provision's plain meaning, the jury was entitled to consider Holober's testimony. Defendant disagrees, relying on this sentence in *People v. Alvarez* (1996) 14 Cal.4th 155, 242–243: "Penal Code section 190.4, subdivision (d), declares in substance that, if the trier of fact at the penalty phase is the same as that at the guilt phase, it *must* consider the guilt phase evidence." But the quoted sentence in *Alvarez* says nothing about whether a jury may consider guilt phase evidence at the special circumstance phase—it merely explains that a jury must consider guilt phase evidence at the penalty phase.

Defendant notes that when the trial court instructed the jury at the special circumstances phase, it told the jury to "decide whether, *from looking at these documents*, . . . [defendant] was previously convicted of murder or not," and to determine "if *the records show* that he was convicted of that murder." Seizing upon the italicized language, defendant argues that the court thereby told the jury not to consider relevant guilt phase evidence. We do not read the court's comments as barring the jury from considering relevant guilt phase evidence that it

---

[11] The word "an" appears to be a drafter's error, and should be either "at" or "in."

50

was statutorily required to consider. And when that evidence is taken into consideration, the evidence is more than sufficient to show that defendant was the person who was convicted of the prior offense.[12]

### c. *Sufficiency of evidence that defendant was convicted of murder*

Finally, defendant asserts that the evidence was insufficient to show that the crime he was convicted of was murder, asserting that "[t]he exhibits do not even mention a prior murder conviction." We disagree. The December 4, 1984, minute order in exhibit 24 states that defendant was appearing for judgment on a conviction. Five counts were listed, one of which was count II, described as "187PC (12022.5 PC) (1st deg)." The minute order is ambiguous with respect to whether the other four counts were dismissed; it showed that a motion had been made to dismiss those counts, but it does not reveal the outcome of that motion. But the minute order unambiguously shows that defendant was convicted and sentenced on count II. And while the minute order's description of the charge in count II may have been unintelligible to the jury, the meaning was clarified by the accompanying fingerprint card, which says that "PC 187/12022.5" is "murder, first degree" with "use of firearm." This is confirmed by: (1) the rap sheet in

---

**12**    Defendant points out that a bracketed portion of CALCRIM No. 750, which is to be given at the special circumstances phase of trials in which the prosecution is alleging a prior murder special circumstance, states: "In deciding whether the People have proved this special circumstance, consider only the evidence presented in this proceeding. Do not consider your verdict or any evidence from the earlier part of the trial." But CALCRIM did not exist at the time of trial and CALCRIM No. 750 was not given here; thus, that instruction has no bearing on the issue before us. The bench notes accompanying CALCRIM No. 750 do not explain why the Judicial Council Advisory Committee on Criminal Jury Instructions included this portion of the instruction in CALCRIM No. 750, and we suggest that the committee reconsider the instruction in light of Penal Code section 190.4, subdivision (d).

51

exhibit 24, which states that defendant was committed to CYA for first degree murder; (2) the information in exhibit 63, count II of which states that defendant was charged with murder in violation of Penal Code section 187; and (3) the minute order in exhibit 63 dated July 13, 1984, which states that defendant pled guilty to count II and the trial court fixed the degree of the offense as first degree.

Defendant points out that a clerk erroneously wrote on the minute order that defendant was committed for "25 years to life plus two years enhancement as to *count I*" (italics added), and argues that the jury should therefore have inferred that the minute order described a conviction for robbery, which was charged in count I, rather than the murder charged in count II. But the jury was not required to draw this inference in view of the other evidence, described above, that defendant was convicted of murder, not robbery. Defendant also argues that the jury should have inferred from the minute order of the proceedings expunging the conviction, which states the guilty plea was withdrawn and the matter was "dismissed nunc pro tunc" on May 18, 1993, that the murder conviction was thereby invalidated. But the jury was not required to draw this legally unsound inference, and the presence of this minute order in exhibit 63 in no way undermines our conclusion that the remaining evidence presented to the jury amply supports its determination that defendant had a prior murder conviction.

### 2. Use of defendant's juvenile conviction to prove the prior-murder special circumstance

Defendant mounts three constitutional attacks on the prior-murder special circumstance, which is based on a murder he committed before he was 18 years old. First, drawing on the reasoning of the United States Supreme Court's decision in *Roper v. Simmons* (2005) 543 U.S. 551 (*Roper*), defendant argues that the Eighth Amendment to the federal Constitution bars imposition of the death penalty based on a prior-murder special circumstance when, as here, the prior

52

murder was committed when defendant was a juvenile. Second, defendant contends that California laws pertaining to the transfer of minors to adult court to face homicide charges permit prosecutors and judges "to make arbitrary and unreliable choices regarding which homicides committed by a person under age 18 can later be used to establish death eligibility." For this reason, he asserts, the Eighth and Fourteenth Amendments prohibit imposition of capital punishment based on a California murder conviction of a juvenile who, like defendant, was charged and convicted of murder as an adult under these provisions. Finally, defendant argues that because California's prior-murder special circumstance applies to murder convictions sustained by juveniles in adult court, but not to murder adjudications sustained by juveniles in juvenile court, the special circumstance violates the Fourteenth Amendment's equal protection clause.

Defendant did not raise these claims at trial, and the Attorney General argues that he has therefore forfeited them, with the exception of the first argument, which relies on a United States Supreme Court decision that was not issued until after defendant's trial. (See *Roper*, *supra*, 543 U.S. 551.) We have, however, consistently considered the merits of attacks on the constitutionality of special circumstance allegations in capital cases even when they were not raised at trial (*People v. Hernandez* (2003) 30 Cal.4th 835, 863), and we do so here.

The claims, however, lack merit, as this court recently explained in *People v. Salazar* (2016) 63 Cal.4th 214. *Salazar* held that *Roper*, *supra*, 543 U.S. 551, does not bar the use of a prior murder committed when the defendant was a juvenile as a special circumstance qualifying the defendant for the death penalty. We explained: "It does not violate the Eighth Amendment for the Legislature to conclude, as a matter of policy, that an adult who murdered as a juvenile, failed to learn from that experience, and killed yet again, is a person 'within the narrowed class of murderers for whom death would be an appropriate penalty.' [Citation.]

53

The punishment is not imposed for the juvenile offense, but for the crime committed as an adult, considered in light of the defendant's criminal history." (*Salazar*, *supra*, 63 Cal.4th at p. 226.) *Salazar* also rejected the claim of the defendant in that case that "the use of juvenile murder convictions as special circumstances violates the Eighth Amendment and the constitutional guarantees of due process and equal protection because California's juvenile transfer policies permit prosecutors and juvenile courts to exercise arbitrary discretion over which homicides result in murder convictions instead of juvenile court adjudications." (*Id*. at p. 227.) We explained that "[t]he prior-murder special circumstance does not turn on the procedures underlying the prior conviction, but on the gravity of the conduct that is the necessary predicate of that conviction." (*Ibid.*) Finally, *Salazar* held that "[e]qual protection principles do not foreclose the Legislature from concluding that those who commit a capital crime after being convicted of a juvenile murder in superior court are more culpable than those whose prior murder was adjudicated in juvenile court." (*Ibid*.)

Defendant offers no persuasive reason to reconsider our resolution of these questions in *Salazar*, and we decline to do so.

### 3. *Constitutionality of the lying-in-wait special circumstance*

Defendant argues that the lying-in-wait special circumstance fails to serve the narrowing function required by the United States Constitution and therefore violates his Eighth and Fourteenth Amendment rights. We have repeatedly rejected this claim (see, e.g., *People v. Casares* (2016) 62 Cal.4th 808, 848–853; *People v. Cage* (2015) 62 Cal.4th 256, 281) and we decline defendant's invitation to reconsider the issue.

**D. Penalty Phase Issues**

*1. Omission of penalty phase instructions on general principles of law*

Before the jury began its penalty deliberations, the trial court instructed it to disregard all prior guilt phase instructions. (CALJIC No. 8.84.1.) It then gave instructions covering, among other things, the jury's consideration of aggravating and mitigating circumstances and its consideration of prior convictions and prior criminal acts offered in aggravation. But it did not reinstruct the jury on the applicable general principles of law. Defendant contends that its failure to do so was prejudicial error.

We agree with defendant that the trial court should have reinstructed the jury. At the penalty phase, the trial court must "instruct sua sponte on the general principles of law relevant to the evidence." (*People v. Daniels* (1991) 52 Cal.3d 815, 885.) If the court instructs the jury at penalty phase to disregard previously given instructions, "it must later provide [the jury] with those instructions applicable to the penalty phase." (*People v. Moon* (2005) 37 Cal.4th 1, 37 (*Moon*).)

The Attorney General argues that defendant invited the error by agreeing to the language of CALJIC No. 8.84.1. We disagree. As we explained when we rejected a somewhat similar contention: "Counsel did not . . . request or invite the trial court to omit from the penalty instructions those instructions he now claims were important. . . . [C]ounsel may well have believed that the court would— consistent with CALJIC No. 8.84.1—later reinstruct the jury with those guilt phase instructions that retained their applicability in the penalty phase." (*Moon*, *supra*, 37 Cal.4th at p. 37, fn. omitted.) Defense counsel's agreement to the use of CALJIC No. 8.84.1 "did not absolve the trial court of its obligation under the law to instruct the jury on the 'general principles of law that [were] closely and openly connected to the facts and that [were] necessary for the jury's understanding of the

55

case.' " (*Ibid.*, quoting *People v. Carter* (2003) 30 Cal.4th 1166, 1219 (*Carter*).) But, as explained below, the error was harmless.

The court's failure to reinstruct on general principles at penalty phase is not necessarily prejudicial, even if the jury has been told to disregard its earlier instructions. (*Moon*, *supra*, 37 Cal.4th at p. 37.) Beyond general (and inadequate) speculation about possible harms that could have flowed from the failure to provide all potentially applicable instructions, defendant mentions only two instructions whose absence, he claims, affected the jury's deliberations: The instruction on factors to consider in assessing witness credibility (CALJIC No. 2.20), and the instruction on factors to consider in proving identity by eyewitness testimony (CALJIC No. 2.92).[13] The latter claim is easily disposed of, because the trial court need not give that instruction unless requested to do so by the defense (*People v. Alcala* (1992) 4 Cal.4th 742, 802–803), and defendant made no such request at the penalty phase. But because trial courts must instruct on factors affecting witness credibility in every case (*Diaz*, *supra*, 60 Cal.4th at p. 1191; *People v. Rincon-Pineda* (1975) 14 Cal.3d 864, 883–884), we consider his argument pertaining to that instruction in greater depth.

Defendant points out that prosecution witness Felton M. testified that, 13 years before trial, defendant robbed and sexually assaulted him at gunpoint and left him naked in a field. Felton also testified that he identified defendant as the perpetrator from a series of photographs he looked at several days after the

---

**13** Although defendant does not mention the point, the trial court also did not reinstruct the jury on the definition of reasonable doubt. But a trial court's failure to redefine reasonable doubt at the penalty phase after giving CALJIC No. 8.84.1 is harmless when, as here, the jury has no reason to believe that reasonable doubt might be defined in any way other than the definition it received at the guilt phase. (*People v. Lopez* (2013) 56 Cal.4th 1028, 1081–1082; *People v. Boyce* (2014) 59 Cal.4th 672, 716–717.)

incident, and that he again identified defendant in a court proceeding.[14]  There is, however, some indication that Felton may have been intellectually disabled, and because the assault occurred when defendant was 16 years old, his appearance may have changed significantly during the 13 years between the attack and the trial.  Each of these circumstances could have affected Felton's ability to identify defendant.  In cross-examination, defense counsel questioned Felton's ability to recall the incident, and in his closing statement counsel argued that Felton's testimony was inadequate to show beyond a reasonable doubt that defendant was the perpetrator.  Defendant asserts that CALJIC No. 2.20 would have assisted the jury in evaluating Felton's testimony.

We have, however, repeatedly found similar errors to be harmless (*People v. Brooks* (2017) 3 Cal.5th 1, 107–109; *People v. Boyce*, *supra*, 59 Cal.4th at pp. 714–717; *People v. Lopez*, *supra*, 56 Cal.4th at pp. 1081–1083; *People v. Souza* (2012) 54 Cal.4th 90, 134–136; *People v. Lewis* (2008) 43 Cal.4th 415, 534–536; *People v. Rogers* (2006) 39 Cal.4th 826, 904; *Moon*, *supra*, 37 Cal.4th at pp. 35–39; *Carter*, *supra*, 30 Cal.4th at pp. 1218–1222), and we reach the same conclusion here.  As we explained in *Lewis*:  "Unlike defendant, 'we see no reason to assume' [citation] that the jurors would have felt free to evaluate the penalty phase evidence in a vacuum, rather than carefully and deliberately, as they apparently had evaluated the guilt phase evidence.  Nothing in the closing arguments of the parties suggested that the jurors were free to make a standardless assessment of the evidence.  Nor did the jurors ask any questions or request clarification as to how to assess any of the penalty phase evidence."  (*Lewis*, at p. 535.)  And, as in *Carter* and *Moon*, defendant "fails to suggest how the jury . . .

---

[14]    The charges were dismissed following defendant's conviction and sentence for the murder of Virgil Fowler.

might have misunderstood or misused" the evidence in question. (*Carter*, at p. 1221; *Moon*, at p. 38.) Defense counsel attacked Felton M.'s credibility in his closing statement, and we see no reason to believe that the jury would not have given his argument the consideration it deserved. We therefore find no reasonable possibility (*People v. Brown* (1988) 46 Cal.3d 432, 446–448 [reasonable-possibility test applies to state law error at the penalty phase]) that the error altered the outcome of the penalty trial.[15]

### 2. *Trial court's denial of defendant's motion to represent himself during penalty phase closing argument*

On the morning scheduled for defendant's penalty phase closing argument, the defense told the trial court that defendant wanted to "relieve [c]ounsel of their current duties" and to represent himself at closing argument. The court denied the request. It noted that defendant's attorneys had provided "wonderful" representation, and it expressed concern that "constant objections" would ensue because defendant would, in effect, use closing argument "as a vehicle for testimony," even if it was not his intention to do so. The court opined: "[G]iven what I know about your personality, I think that it would just be a matter of time before you'd . . . lose your temper." As if to illustrate the court's concern, defendant responded, "I don't want these people to represent me any fucking longer," and, when defense counsel requested three minutes to gather his things, defendant unsuccessfully demanded that the jury be brought in immediately, stating: "I don't need three minutes. I don't need three minutes for shit."

---

[15]     We reiterate the admonition we gave in *Carter*, *supra*, 30 Cal.4th at page 1222: "[W]e strongly caution trial courts not to dispense with penalty phase evidentiary instructions in the future. The cost in time of providing such instructions is minimal, and the potential for prejudice in their absence surely justifies doing so."

Defendant argues that the trial court erroneously denied his request to represent himself at the penalty phase closing argument, in violation of the state and federal Constitutions. We disagree.

"[I]n order to invoke the constitutionally mandated unconditional right of self-representation a defendant in a criminal trial should make an unequivocal assertion of that right within a reasonable time prior to the commencement of trial." (*People v. Windham* (1977) 19 Cal.3d 121, 127–128 (*Windham*), fn. omitted.) "[O]nce a defendant has chosen to proceed to trial represented by counsel, demands by such defendant that he be permitted to discharge his attorney and assume the defense himself shall be addressed to the sound discretion of the court. . . . Among other factors to be considered by the court in assessing such requests made after the commencement of trial are the quality of counsel's representation of the defendant, the defendant's prior proclivity to substitute counsel, the reasons for the request, the length and stage of the proceedings, and the disruption or delay which might reasonably be expected to follow the granting of such a motion." (*Id.* at p. 128.) "A trial court abuses its discretion when its ruling 'fall[s] "outside the bounds of reason." ' " (*People v. Waidla* (2000) 22 Cal.4th 690, 714.)

Applying that standard, we find no abuse of discretion. As in *Windham*, *supra*, 19 Cal.3d at page 130, "defendant's request came at an exceedingly late stage of the trial. Denial of the motion for self-representation resulted in nothing more than preventing defendant from addressing the jury during closing argument." The trial court could reasonably believe that granting the motion would be disruptive because defendant would have difficulty controlling his temper and because it would be hard for him not to use closing argument as a vehicle for offering new testimony "while not under oath or subject to cross-examination." (*Ibid.*) And the court could reasonably conclude that defendant's

59

attorneys had provided high quality representation before the self-representation request. Thus, as in *Mayfield*, *supra*, 14 Cal.4th at page 810, "[b]ecause two of [the *Windham*] factors—the quality of counsel's representation and the disruption that granting the motion would cause—weighed strongly against the granting of the motion, denial of the motion was not an abuse of the trial court's discretion."

Defendant does not appear to disagree that an untimely *Faretta* motion (*Faretta v. California* (1975) 422 U.S. 806) is addressed to the trial court's discretion. But he argues that the only factors the trial court may consider are the request's equivocal or unequivocal character and its potential for causing delay or other disruption. He argues *Windham* was wrong to permit courts to consider other factors—an error, he contends, that is traceable to a mistaken assumption that the self-representation right disappears once trial has begun. We disagree. In exercising its discretion over an untimely request, the court must consider whether any disruption that would be caused by granting the request is likely to be aggravated, mitigated or justified by the surrounding circumstances, including the quality of counsel's representation to that point, the reasons the defendant gives for the request, and the defendant's proclivity for substituting counsel. Defendant cites no authority, and we are aware of none, to suggest that these considerations are impermissible under *Faretta*.

### 3. Challenges to California's death penalty statute

Defendant raises a series of challenges to California's death penalty statute on grounds that we have repeatedly rejected. We decline to revisit our prior holdings.

60

"[Penal Code] [s]ection 190.3 sufficiently narrows the class of murderers eligible for capital punishment." (*People v. Harris* (2008) 43 Cal.4th 1269, 1322.) " '[C]onsideration of the circumstances of the crime under section 190.3, factor (a) does not result in arbitrary or capricious imposition of the death penalty.' " (*People v. Brasure* (2008) 42 Cal.4th 1037, 1066.)

" 'Neither the federal nor the state Constitution requires that the penalty phase jury make *unanimous* findings concerning the particular aggravating circumstances, find all aggravating factors *beyond a reasonable doubt*, or find beyond a reasonable doubt that the aggravating factors *outweigh* the mitigating factors.' " (*People v. Linton* (2013) 56 Cal.4th 1146, 1215.) "Nor are the instructions unconstitutional for failing to prescribe any burden of proof, require juror unanimity, or set out a 'presumption of life.' " (*People v. Howard* (2010) 51 Cal.4th 15, 39.) The United States Supreme Court's recent decision in *Hurst v. Florida* (2016) 577 U.S. ___ [136 S.Ct. 616], does not alter this conclusion. (*People v. Jackson* (2016) 1 Cal.5th 269, 374; *People v. Rangel* (2016) 62 Cal.4th 1192, 1235 & fn. 16.)

"Consideration by the jury of unadjudicated criminal conduct at the penalty phase does not violate the state or federal Constitution." (*Duff*, *supra*, 58 Cal.4th at p. 570.) The jury need not unanimously find the prior criminal activity occurred. (*Ibid*.)

The trial court had no duty to instruct the jury that it could sentence defendant to life without possibility of parole even if it determined that the "aggravating circumstances are so substantial in comparison with mitigating circumstances as to warrant the death penalty." (*People v. Smith* (2005) 35 Cal.4th 334, 370.) Nor need the jury be instructed on a "presumption" favoring life imprisonment. (*People v. Wall* (2017) 3 Cal.5th 1048, 1072.)

" 'The California death penalty statute is not unconstitutional in failing to require the jury to make written findings concerning the aggravating circumstances it relied upon, nor does the failure to require written findings preclude meaningful appellate review.' " (*People v. Salcido* (2008) 44 Cal.4th 93, 166, quoting *People v. Prince* (2007) 40 Cal.4th 1179, 1297.)

"CALJIC No. 8.85 does not violate the Sixth, Eighth, or Fourteenth Amendments by including vague factors, by failing to delete inapplicable factors or differentiate between aggravating and mitigating factors, by using the adjectives 'extreme' and 'substantial,' or by omitting a burden of proof as to either mitigation or aggravation." (*People v. Williams* (2013) 56 Cal.4th 165, 201.)

"Intercase proportionality review is not required." (*People v. Livingston* (2012) 53 Cal.4th 1145, 1180.)  "The California death penalty scheme does not violate equal protection by treating capital and noncapital defendants differently." (*Ibid.*)  "California's death penalty scheme does not violate international law and norms." (*People v. Mai* (2013) 57 Cal.4th 986, 1058.)

## III. DISPOSITION

We affirm the judgment.

**KRUGER, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**CHIN, J.**
**CORRIGAN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**BENKE, J.***

---

\*      Associate Justice of the Court of Appeal, Fourth Appellate District, Division One, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Smith

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**


_____

**Opinion No.** S065233
**Date Filed:** May 21, 2018

_____

**Court:** Superior
**County:** San Bernardino
**Judge:** John W. Kennedy


_____

**Counsel:**

Michael J. Hersek and Mary K. McComb, State Public Defenders, under appointments by the Supreme Court, Barry P. Helft, Chief Deputy State Public Defender, Joseph E. Chabot, Jamilla Moore and Elias Batchelder, Deputy State Public Defenders, for Defendant and Appellant.

Edmund G. Brown, Jr., and Xavier Becerra, Attorneys General, Dane R. Gillette and Gerald A. Engler, Chief Assistant Attorneys General, Gary W. Schons and Julie L. Garland, Assistant Attorneys General, Annie Featherman Fraser, Gil Gonzalez, Holly D. Wilkens, Kimberley A. Donohue and Allison V. Acosta, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Elias Batchelder
Deputy State Public Defender
1111 Broadway, 10th Floor
Oakland, CA  94607
(510) 267-3300

Allison V. Acosta
Deputy Attorney General
600 West Broadway, Suite 1800
San Diego, CA  92101
(619) 738-9111