Filed 5/21/26  P. v. Hoover CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JERAMIE SKYLAR HOOVER,<br><br>    Defendant and Appellant. | F087544<br><br>(Super. Ct. No. CR-21-000042)<br><br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Stanislaus County.  Linda A. McFadden, Judge.

Valerie G. Wass, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Ivan P. Marrs and Eric L. Christoffersen, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

**INTRODUCTION**

Defendant Jeramie Skylar Hoover was convicted in January 2024 of one count of murder, one count of possession of a firearm, and one count of possession of ammunition by a prohibited person, as well as several enhancements.  Defendant argues on appeal that

there was insufficient evidence of premeditation and deliberation for a jury to convict him of first degree murder. We do not agree. Substantial evidence of premeditation and deliberation was presented to the jury in the form of defendant's own post-conviction statements and explanations about why he shot the victim. While these explanations varied depending on the audience, and were sometimes inconsistent, the jury heard statements from the defendant that the gun initially went off accidentally. Defendant then recounted that, after firing the accidental shot, defendant considered that the victim, who was a friend of his, would never forgive him and would seek retribution, and defendant therefore decided to continue shooting the victim until he was dead. This evidence is sufficient to show that, prior to the killing, defendant reflected about his actions and came to a reasoned conclusion about why he should kill the victim. This is sufficient evidence of premeditation and deliberation to sustain the conviction.

Defendant also raises arguments on appeal of instructional error. First, he claims the pattern instruction, CALCRIM No. 521, is incorrect as a matter of law, because it instructs the jury they may convict for first degree murder merely based on a finding that the intent to kill was formed before the killing. Upon reviewing the instruction in its entirety, this is clearly not what the instruction says. Moreover, the pattern instruction directly follows the well-established law regarding first degree murder set forth by our Supreme Court. Second, defendant claims the court's responses to questions from the jury regarding the first and second degree murder instructions constitute reversible error because the court did not explain these terms in a different way, or re-read the instruction on provocation. Defendant forfeited this argument by failing to object to the court's proposed response. Even if we reach the argument, we find no abuse of discretion by the trial court, as its responses were entirely proper. Accordingly, we affirm defendant's conviction.

## FACTUAL BACKGROUND

On November 16, 2020, defendant contacted his cousin about purchasing a ghost gun. Defendant and his cousin knew each other from their time in jail together. Defendant's cousin sold both drugs and firearms during this time. Defendant did not have the $600 his cousin wanted for the gun, so defendant and his cousin agreed that defendant would try to find another buyer for the gun to sell it to for $800, with the remaining $200 going towards another ghost gun defendant's cousin would make.[1] A short while later, defendant contacted his cousin, saying he had located a buyer, namely, the victim in this case. Defendant asked his cousin for a ride to meet the victim, and the three met in the parking lot of an auto parts store.

Defendant and his cousin drove to the auto parts store with the gun in the center console of defendant's cousin's vehicle, where they met the victim. The ghost gun defendant was selling, which did not have a safety, was loaded with rounds in the magazine, but did not have a round chambered. Defendant's cousin backed into the stall next to the victim's car. Defendant's cousin testified that defendant took the gun and exited the car to go sell it to the victim. Defendant did not talk about trying to rob the victim or express any anger or hostility toward the victim; however, he did appear anxious. Defendant's cousin had not talked to the victim about the purchase, as the deal was arranged by the defendant.

The victim was standing in the parking lot with another man who was purchasing methamphetamine from the victim. After the drug sale concluded, defendant took the gun from the center console and got out of the car. Defendant's cousin testified he could

---

[1] While a number of the facts of this case, including whose idea it was to sell the gun to the victim, were contested at trial, we recount the facts here in the light most favorable to the judgment, given that the main issue on appeal is a challenge to the sufficiency of the evidence. (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) The other issues raised on appeal are not fact-dependent but rather relate to purported legal error in the jury instructions.

see them talking at the rear of the car.  While looking at his phone, he heard gunshots, and turned down his radio, at which point he heard three more gunshots.  After hearing those shots, defendant jumped into the car and told his cousin to drive.  The man who had just purchased drugs from the victim testified that he heard shots as well as he was returning to his car.  Another person at the scene saw a "dude with a hood on"[2] pointing a gun at the victim, who was approximately seven feet away and appeared to be trying to run away.  This person recalled that the victim did not have a weapon of any kind in his hands.  He saw the shooter jump in a car and leave.  A bystander exiting a nearby business heard four gunshots as well and drove over to find the victim, who had been shot, lying on the ground.  The bystander attempted to apply pressure to the victim's wounds to stop the bleeding until an ambulance arrived and took him away.

The victim died at the hospital shortly thereafter.  He had six gunshot wounds on the back side of his body.  There was no stippling or gun powder residue on the victim's body, suggesting he was shot from more than 18 inches away.

Following the shooting, defendant fled in his cousin's car.  Defendant was still holding the gun.  Defendant's cousin asked him what happened, to which defendant first replied, "I don't know," before saying that the victim "went for the gun."  Defendant's cousin drove to a neighboring town, at which point defendant told him to get out of the car.  Defendant's cousin complied and walked away, and defendant left in the car.

Shortly after the shooting, the victim's aunt heard that defendant had shot her nephew.  The victim's aunt posted a request on Facebook for the defendant to call her and included her cell phone number.  A few days later, defendant called the victim's aunt.  Defendant identified himself.  He told the victim's aunt that the victim went for the gun while he was sitting in the car, at which point she noted the victim was shot five times

---

**2**      Defendant was later asked if he was wearing a hooded sweatshirt on the day in question, and remarked, "I always [wear] a hoody."

outside of the car, thus calling into question the veracity of defendant's statement. Defendant then took a long pause before giving another reason for the shooting, which was that the gun initially went off accidentally. According to defendant, "he knew if he threw his self on his knees to [the victim] that [the victim] would have never forgiven him and they would [have] taken him out. So he had to do [the victim] in and he unloaded the gun on [the victim]." Defendant believed "the streets would have taken [him] out" for accidentally shooting the victim. Defendant spoke to the victim's aunt for approximately 15 minutes, the second half of which was recorded. Defendant told the victim's aunt that he was "loaded top to bottom with 1500 round clips," and was "going to take the police out if they came for him." A transcript of the second half of this conversation was entered as an exhibit at trial, which included similar statements to the ones the victim's aunt had recalled.

Defendant later called one of the detectives who was investigating the case. Defendant acknowledged he had intended to sell the victim a gun, but asserted the victim was reaching for the gun and was attempting to steal it and "punk" defendant. Defendant said he felt his life was in danger, and that the victim "just went for the gun so many times I just got fed up with it." Defendant told the detective he pulled the gun out, and then "blacked out," even though he was sober. He claimed to remember only firing the gun one time. Additionally, a call made by defendant from the jail following his arrest was also played for the jury. In the recording, defendant told the woman to whom he was speaking, "Why would I whip out and not use? Brah, what the hell? A pussy only whips out and shows and tells. … [Y]ou never whip out unless you gonna use."

Authorities eventually determined defendant was in Oklahoma by tracing his cell phone. He was arrested a few days later by local authorities.

Defendant testified on his own behalf. At trial, he acknowledged shooting the victim, and asserted he shot the victim because he felt his life was in danger. According to defendant, the victim was reaching for the firearm defendant was going to sell him.

5.

Prior to this, defendant and the victim were friends. He testified he had previously seen a friend get shot in a "drug deal gone bad" by "one of his close friends." According to defendant, he called the victim because defendant's cousin wanted him to find a buyer for the gun. Defendant testified that they drove to the auto parts store, where he saw the victim standing outside of his vehicle. The victim and defendant greeted each other, at which point, defendant testified his cousin said, "Change of plans, you owe the homie money." Defendant testified that he saw his cousin pointing a gun at the victim, apparently deciding to rob the victim. Defendant then claimed the victim started "reaching for something"—albeit apparently not the firearm defendant intended to sell him—which defendant believed was a firearm with which to shoot defendant. Defendant claimed he fired a warning shot into the victim's car, but "[h]e kept reaching so I fired upon the victim." According to defendant, after he shot the victim, he realized the victim did not have a gun. Defendant and his cousin then left.

As they drove away, defendant testified they were arguing about why his cousin changed the plan, at which point they made up a story that the victim was reaching for the gun. According to defendant, it was their plan for defendant to take the blame for shooting the victim, because defendant's cousin was a father. Defendant testified that his cousin instructed him to call the victim's aunt, as well as the police detective with whom he spoke. He also stated that his cousin was also on the phone via three-way calling during these conversations and texted him communications about what to say.

## PROCEDURAL BACKGROUND

A complaint was initially filed against defendant on January 6, 2021. The information filed on August 26, 2021 ultimately charged defendant with one count of murder (Pen. Code,[3] § 187, subd. (a); count 1); one count of being a felon in possession of a firearm (§ 29800, subd. (a)(1); count 2); and one count of being a prohibited person

---

[3] All further statutory citations are to the Penal Code, unless otherwise indicated.

6.

in possession of ammunition (§ 30305, subd. (a)(1); count 3). The information also charged defendant with an enhancement for personally discharging a firearm that caused death to another person (§ 12022.53, subd. (d)) in connection with count 1. Lastly, the information alleged the existence of a prior serious felony, pursuant to section 667, subdivision (d).

Trial in the case occurred in October 2023. The trial lasted 11 days, at which point the case was given to the jury. During the course of deliberations, the jury asked the court several questions regarding certain instructions. The jury deliberated for approximately one day before returning guilty verdicts on all three counts, as well as finding true the alleged enhancements. The court sentenced defendant to 25 years to life on count 1, which was doubled due to his prior serious felony pursuant to section 667, subdivision (e). He was sentenced to a further 25 years to life for the enhancement pursuant to section 12022.53, subdivision (d). Defendant was also sentenced to an additional five years, pursuant to section 667, subdivision (a), for a total sentence on count 1 of 80 years to life. Defendant was sentenced to four years on each of counts 2 and 3, the sentences for which were stayed pursuant to section 654.

Defendant timely filed his notice of appeal.

## DISCUSSION

I. **There Was Substantial Evidence of Premeditation and Deliberation**

Defendant's primary argument on appeal is that there was no substantial evidence of premeditation and deliberation, and thus he could not have been convicted of first degree murder. He argues there was no evidence of prior planning to commit the murder, there was no evidence of motive, and the manner of the killing does not indicate a preconceived design.

In a sufficiency of the evidence review, we look to whether the record considered as a whole contains substantial evidence to support the conviction, that is, "evidence which is reasonable, credible, and of solid value from which a rational trier of fact could

7.

find defendant guilty beyond a reasonable doubt." (*People v. Cage* (2015) 62 Cal.4th 256, 275.) We review the record in the light most favorable to the verdict rendered by the trier of fact. (*People v. Ramirez* (2022) 14 Cal.5th 176, 190.) It is only where no rational trier of fact could find " 'the essential elements of the crime beyond a reasonable doubt' " that we reverse for a failure of substantial evidence, because " 'it is the jury, not the appellate court[,] which must be convinced of the defendant's guilt.' " (See *People v. Nguyen* (2015) 61 Cal.4th 1015, 1055–1056.) While we will draw all reasonable inferences in favor of the verdict rendered below, " '[a] reasonable inference … "may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work." ' " (*People v. Davis* (2013) 57 Cal.4th 353, 360.)

"Murder is the unlawful killing of a human being … with malice aforethought." (§ 187, subd. (a).) Malice can be either express or implied, in the former case "when there is manifested a deliberate intention to unlawfully take away the life of a fellow creature" and in the latter "when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." (§ 188, subd. (a)(1)-(2).) First degree murder occurs by, among other factors, the "willful, deliberate, and premeditated killing" of another. (§ 189, subd. (a).)

The term " 'premeditated' means 'considered beforehand,' " and the term deliberate means " 'formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action.' " (*People v. Mayfield* (1997) 14 Cal.4th 668, 767, abrogated on other grounds in *People v. Scott* (2015) 61 Cal.4th 363; see *People v. Koontz* (2002) 27 Cal.4th 1041, 1080.) A finding of premeditation and deliberation does not require a finding that " ' "any extended period of time" ' " elapsed, because " ' " [t]he true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly.' " ' " (*People v. Watkins* (2012) 55 Cal.4th 999, 1026.) " 'A verdict of deliberate and premeditated first degree murder

8.

requires more than a showing of intent to kill.' " (*People v. Solomon* (2010) 49 Cal.4th 792, 812.) Instead, "the intent to kill must be formed upon a preexisting reflection and have been the subject of actual deliberation or forethought." (*People v. Whisenhunt* (2008) 44 Cal.4th 174, 201.) Of course, premeditation and deliberation may be shown by circumstantial evidence. (*People v. Anderson* (1968) 70 Cal.2d 15, 25 (*Anderson*).) However, the presumption remains that an "unjustified killing of a human being constitutes murder of the second, rather than of the first, degree," and as such, the burden remains on the People to prove beyond a reasonable doubt that premeditation and deliberation are present. (*Ibid.*) Our Supreme Court has noted that a finding of premeditation and deliberation " 'is proper only if the slayer killed "as a result of careful thought and weighing of considerations; as a *deliberate* judgment or plan; carried on coolly and steadily, [especially] according to a *preconceived* design." ' " (*Id.* at p. 26.)

According to the California Supreme Court, the type of evidence generally found sufficient to show premeditation and deliberation usually falls into one of three categories: (1) evidence prior to the killing which shows planning; (2) facts about the prior relationship of the killer and the victim which tend to show motive; and (3) facts about the nature of the killing which tend to show the defendant must have acted according to a preconceived plan. (*Anderson*, *supra*, 70 Cal.2d at pp. 26–27.) This list is "descriptive, not normative," and the purpose of elaborating these was merely to assist appellate courts in reviewing such cases, not to "alter the substantive law of murder in any way." (*People v. Alvarez* (2025) 18 Cal.5th 387, 471.) "The *Anderson* factors, while helpful for purposes of review, are not a sine qua non to finding first degree premeditated murder, nor are they exclusive." (*People v. Perez* (1992) 2 Cal.4th 1117, 1125.)

Here, we have no trouble finding sufficient evidence of premeditation and deliberation. Defendant's exclusive focus on the *Anderson* factors in his brief is a prime example of why this list is descriptive, and not normative: they are descriptive of the usual case in which there is only circumstantial evidence of premeditation and

deliberation.  Here, there was significant *direct* evidence of premeditation and deliberation, because defendant made a wide variety of different statements to different parties following the shooting explaining exactly what his thinking was prior to the shooting.  Some of these tended to show deliberation in various ways.  For instance, defendant told the victim's aunt in a phone call that the gun went off accidentally, but that the defendant "knew if he threw his self on his knees to [the victim] that [the victim] would have never forgiven him and they would [have] taken him out.  So he had to do [the victim] in and he unloaded the gun on [the victim]."  The transcript of the recording played at trial recounts defendant saying, "the gun accidentally went off" and after that, "I just finished him off."  This tends to show premeditation and deliberation, because it shows that defendant reflected and came to a reasoned conclusion—i.e., that the victim would never forgive defendant for wounding him and would seek to hurt or kill defendant—before electing to continuing shooting the victim to ensure he was dead.

Alternatively, another of the stories told by defendant suggested he killed the victim because he believed the victim intended to steal from him.  Defendant told the police detective whom he spoke to on the phone that he believed the victim was trying to "punk" him or steal from him.  He recounted to the detective that he was "fed up" with the victim's attempts to handle the gun, even though he was supposed to be selling the victim the gun, noting the victim was not following the plan whereby they would make the exchange in the victim's car.  Defendant also told a female acquaintance in a recorded phone call that "[a] pussy only whips out [his gun] and shows and tells," and "you never whip out unless you gonna use."  This direct evidence in the form of defendant's own explanations suggests other reasons for the shooting which the jury could have concluded were formed ahead of the actual killing, namely. that defendant acted out of retribution, or annoyance, or to enhance his reputation.  It also suggests defendant had already formed the decision well before the shooting that, if he drew a firearm, he was going to use it.  And each of these potential motivations, either separate or in various

10.

combinations with others, are consistent with defendant considering his actions prior to acting.

To be sure, defendant told other versions of the story which tended to at least partially exculpate him. He recounted to the detective at one point that he "blacked out," thus suggesting he did not know why he shot the victim multiple times. He also told the detective that he was afraid of the victim, noting that he needed to grab the gun before the victim did. And defendant testified at trial that he believed the victim was going to shoot him with the gun. The jury would have been entitled to believe these versions of the events and convict defendant of a lesser-included offense.

Parsing which of these many versions was true is not our task; it was the jury's. We need only and do only find that defendant's own numerous statements after the shooting explaining his motivations for killing the victim provided substantial evidence from which a reasonable trier of fact could have concluded beyond a reasonable doubt that defendant acted with premeditation and deliberation. That some of these accounts conflicted with each other merely shows this was a problem for the jury to resolve through the traditional means for understanding evidence: observing the witnesses and their demeanors; considering their responses on cross-examination; and deriving reasonable inferences and conclusions about the truth of defendant's motivations based on their observations and the circumstances of these various accounts. Because there was direct evidence from defendant explaining his thought process—albeit, explaining that process in varied and sometimes contradictory ways—the *Anderson* factors are of considerably less importance, and do not provide as strong of a guide for our review of the sufficiency of the evidence. This is why our Supreme Court has consistently noted these are not normative or necessary factors that must be proven, but merely helpful guides to use in the usual case, where the defendant does not directly explain his thought processes.

## II. The Definition of Premeditation in CALCRIM No. 521 is Correct

Defendant's next argument is that the criminal instruction on first degree murder given at trial was incorrect, because it indicated to the jury that it can find deliberation and premeditation merely by finding that defendant had decided to kill the victim temporally prior to shooting him. This argument borders on frivolity. Assuming we ignore any potential forfeiture[4] and reviewing de novo,[5] the trial court apparently gave the pattern instruction, CALCRIM No. 521, essentially verbatim.[6] The instruction is a correct statement of the law.

Defendant takes issue with one sentence contained within the instruction—"[t]he defendant acted with premeditation if he decided to kill before completing the act that caused death"—because, he argues, premeditation does not mean only that the killer decided to kill prior to the slaying. (Italics omitted.) Our Supreme Court has repeatedly said, however, that in the context of first degree murder, " ' "premeditated" means "considered beforehand." ' " (*People v. Jennings* (2010) 50 Cal.4th 616, 645; see *In re Lopez* (2023) 14 Cal.5th 562, 580; *People v. Morales* (2020) 10 Cal.5th 76, 88; *People v. Potts* (2019) 6 Cal.5th 1012, 1027; *People v. Smith* (2018) 4 Cal.5th 1134, 1164; *People v. Salazar* (2016) 63 Cal.4th 214, 245; *People v. Jurado* (2006) 38 Cal.4th 72, 118.) The pattern instruction contains a pervasively well-established statement of black letter law.

---

**4** Defendant concedes he did not object at trial. Normally, this would forfeit an issue on appeal. (*People v. Bolin* (1998) 18 Cal.4th 297, 326; *People v. Jennings* (1991) 53 Cal.3d 334, 374.) Of course, we may "review any instruction given, refused or modified, even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby." (§ 1259; *People v. Smithey* (1999) 20 Cal.4th 936, 976, fn. 7.) The People apparently concede the substantial rights of the defendant would be affected by the error claimed, and thus this issue is reviewable. Therefore, we do not reach the issue of forfeiture.

**5** " 'A claim of instructional error is reviewed de novo.' " (*People v. Sorden* (2021) 65 Cal.App.5th 582, 599.)

**6** The written instructions contain one minor notated difference which is not relevant to the issue raised and, if anything, benefitted defendant.

Defendant's legal citations are not to the contrary. Defendant argues, "[p]remeditation requires 'substantially more reflection than may be involved in the mere formation of a specific intent to kill,' " and cites as authority *People v. Thomas* (1945) 25 Cal.2d 880, 900. What *Thomas* actually says is, "By conjoining the words 'willful, deliberate, and premeditated' in its definition and limitation of the character of killings falling within murder of the first degree the Legislature apparently emphasized its intention to require as an element of such crime substantially more reflection than may be involved in the mere formation of a specific intent to kill." (*Ibid*.) Thus, the three separate terms—"willful," "deliberate," and "premeditated"—*collectively* indicate that more than mere intent to kill formed ahead of time must be present. This case does not say "premeditation" on its own means anything other than "considered beforehand." Defendant's other legal citations similarly fail to reflect that the holdings of these older cases discuss the general requirements of willfulness, deliberation, and premeditation collectively, and do not focus exclusively on "premeditation." (See *People v. Bender* (1945) 27 Cal.2d 164, 183, abrogated on other grounds in *People v. Lasko* (2000) 23 Cal.4th 101; *Anderson*, *supra*, 70 Cal.2d at pp. 24–27; *People v. Boatman* (2013) 221 Cal.App.4th 1253, 1268.)

Moreover, read in its entirety, the instruction given by the trial court correctly advised the jury that it must find more than mere temporal priority of an intent to kill in order to convict defendant of first degree murder. The instruction given by the court noted that the defendant "acted *willfully* if he intended to kill," "acted *deliberately* if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill," and "acted with *premeditation* if he decided to kill before completing the acts that caused death." It then went on to explain:

> "The length of time the person spends considering whether to kill does not alone determine whether the killing is deliberate and premeditated. The amount of time required for deliberation and premeditation may vary

13.

> from person to person and according to the circumstances. A decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated. On the other hand, a cold, calculated decision to kill can be reached quickly. The test is the extent of the reflection, not the length of time."

All of this is a correct summation of the law of first degree murder, according to our Supreme Court. (*People v. Alvarez*, *supra*, 18 Cal.5th at p. 470; *In re Lopez*, *supra*, 14 Cal.5th at p. 580; *People v. Morales*, *supra*, 10 Cal.5th at p. 88; *People v. Potts*, *supra*, 6 Cal.5th at p. 1027; *People v. Smith*, *supra*, 4 Cal.5th at p. 1164; *People v. Salazar*, *supra*, 63 Cal.4th at p. 245; *People v. Jurado*, *supra*, 38 Cal.4th at pp. 118–119.) Taken collectively, it clearly advised the jury that it must find more than merely that defendant had formed an intent to kill before he killed in order to convict him of first degree murder. The jury was also required to find that the defendant acted willfully and deliberately, both of which the jury apparently found. There was no instructional error.

## III.     The Trial Court's Response to the Jury's Questions Was Not Inadequate

Lastly, defendant claims error occurred in the trial court's response to certain questions submitted by the jury. The jury asked that the court "please explain in a different manner voluntary versus involuntary manslaughter," as well as to "please explain in a different manner first degree versus second degree murder." The court advised that there was no involuntary manslaughter instruction given, and there were no involuntary manslaughter verdict forms in this case. It then proceeded to re-read instruction Nos. 520, 521, and 571, which were the instructions defining murder, first degree and second degree murder, and voluntary manslaughter based on imperfect self-defense. The jury later asked, "If we all agree on 520 but not on 521[,] is that the qualification for 2nd degree murder?" The court gave a written reply stating, "The elements for murder are listed in Calcrim 520 and the requirements for first degree are listed in Calcrim 521. The People have the burden of proving each element beyond a reasonable doubt. All 12 jurors must agree to any verdict and finding." Defendant

14.

acknowledges in his briefing that the record contains no indication that any objections were lodged by him to either of these answers but claims we should nevertheless consider it based on a claim of ineffective assistance of counsel.

First, it is abundantly clear that defendant forfeited any claim of error related to these responses by failing to object to the proposed response. (*People v. Rogers* (2006) 39 Cal.4th 826, 877 [defendant's "acquiescence in the trial court's response forfeits the claim of error on appeal"]; *People v. Roldan* (2005) 35 Cal.4th 646, 729 ["[w]hen a trial court decides to respond to a jury's note, counsel's silence waives any objection under section 1138"], disapproved on other grounds by *People v. Doolin* (2009) 45 Cal.4th 390.) This alone is sufficient to reject appellant's argument here.

Second, the cursory ineffective assistance of counsel arguments made by defendant to excuse his forfeiture are not persuasive. All defendants are entitled to not only assistance of counsel, but effective assistance of counsel, under the Sixth Amendment. (*Strickland v. Washington* (1984) 466 U.S. 668, 686.) In order to prevail on a claim that trial counsel fell below the minimum level of constitutional effectiveness, a defendant must first show counsel's performance "fell below an objective standard of reasonableness," considering all circumstances. (*Id.* at p. 688.) We review counsel's performance in a "highly deferential" manner and must be convinced that a defendant making such claims has overcome a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." (*Id.* at p. 689.)

The sole issue to which defendant points showing constitutionally ineffective assistance of counsel is that, in responding to the jury's questions about first and second degree murder, trial counsel did not also request the court to re-read the instruction on provocation, which was instruction No. 522. We find this insufficient in this case to overcome the strong presumption of reasonableness of counsel's performance. First, this claim is not supported by the record. The record does not contain any discussions between the court and counsel about responding to the first question from the jury. As

15.

such, the record does not, in fact, show that trial counsel failed to request this instruction be read. Second, in response to the jury's first question asking for a different explanation of the degrees of murder, the court simply re-read the instructions defining murder, and first and second degree murder, which was an entirely appropriate response. Additionally, the court re-read the instruction on imperfect self-defense, specifically noting to the jury that if it found the defendant acted in complete self-defense, he was not guilty of any crime, and if he acted in imperfect self-defense, he was not guilty of murder, but rather of voluntary manslaughter. Re-reading the instruction on provocation, which the jury had not mentioned or asked about, would have added little, since the jury was already reminded during the response about self-defense, both complete and imperfect. Even assuming the record supported this, failing to ask for even more instructions to be re-read to a jury, especially when the jury's question did not directly relate to those instructions, is not ineffective assistance of counsel in this circumstance.

The jury's second question specifically referenced instruction Nos. 520 and 521, and asked, "If we all agree on 520 but not on 521[,] is that the qualification for 2nd degree murder?" From this question, it was reasonable for trial counsel to believe he had convinced at least some of the jurors not to convict his client of first degree murder. Indeed, in addressing the question in court, trial counsel commented, "[s]ounds like they are on the right track," and proposed not re-reading *any* of the instructions again. It was reasonable for trial counsel to not further burden the jury with an instruction they had not asked about, especially when it appeared at least some of the jury might be inclined to return a lesser verdict than sought by the prosecution.

Lastly, even if we set aside defendant's forfeiture of this issue, we would not overturn the verdict based on the trial court's responses to the jury's questions, as we find no reversible error. "An appellate court applies the abuse of discretion standard of review to any decision by a trial court to instruct, or not to instruct, in its exercise of its supervision over a deliberating jury." (*People v. Waidla* (2000) 22 Cal.4th 690, 745–

16.

746.) Defendant contends that the trial court's response here was inappropriate because the jury had asked the court to explain first degree and second degree murder in a *different* manner, and the court responded by merely re-reading the instructions already given. Defendant contends the court also should have re-read instruction No. 522 on provocation. However, we see no abuse of discretion in re-directing the jury to the agreed-upon instructions—which were pattern instructions approved by the Judicial Council of California and commonly in use in the courts of this state—to encourage them to engage in further deliberations. It is by no means uncommon for a jury to want different or additional instructions, or to signal that it is having trouble reaching a decision on a particular issue and ask for further instructions in hopes of reaching unanimity. The trial court declining to change its instructions in response to such a question from a jury that had been deliberating for less than one day does not show it abused its discretion, but rather that it re-focused the jury on the legal standard the prosecution was required to meet in order to prove its case. The fact that the instructions to which the jury was directed were standardized, agreed upon, and approved by the Judicial Council is all the more reason to believe this was an appropriate exercise of discretion. Further, since the jury's questions did not ask about the standard for provocation, there was no need for the court to further instruct the jury on that topic.

## DISPOSITION

Given the foregoing, defendant's judgment is affirmed.


                                                    DE SANTOS, J.

WE CONCUR:


FRANSON, Acting P. J.


SNAUFFER, J.

17.